1

```
               IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION

UNITED STATES OF AMERICA      )  Case No. 23 CR 54-3
                              )
            v.                )
                              )
DAVID R. LIRA,                )  Chicago, Illinois
                              )  October 6, 2025
                Defendant.    )  11:00 a.m.


            TRANSCRIPT OF PROCEEDINGS - SENTENCING
          BEFORE THE HONORABLE MARY M. ROWLAND

APPEARANCES:


For the Government:  HONORABLE ANDREW S. BOUTROS
                     UNITED STATES ATTORNEY
                     BY:  MR. JARED HASTEN
                          MS. EMILY VERMYLEN
                     Assistant United States Attorneys
                     219 S. Dearborn Street, 5th Floor
                     Chicago, Illinois 60604


For the Defendant:   CHERONIS & PARENTE LLC
                     BY:  MR. DAMON M. CHERONIS
                          MR. RYAN J. LEVITT
                          MS. AUBREA R. DRAKE
                     140 S. Dearborn Street, Suite 404
                     Chicago, Illinois 60603


Also Present:        OFFICER KELLY KWONG, U.S. Probation


Court Reporter:      LAURA RENKE, CSR, RDR, CRR
                     Official Court Reporter
                     219 S. Dearborn Street, Room 1224
                     Chicago, Illinois 60604
                     312.435.6053
                     laura_renke@ilnd.uscourts.gov


                     * * * * *
            PROCEEDINGS REPORTED BY STENOTYPE
   TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

(Proceedings heard in open court; defendant present:)

THE CLERK: All rise. This court resumes in session. (Call to order.)

THE COURT: Good morning, everyone.

MULTIPLE COUNSEL: Good morning, your Honor.

THE CLERK: Calling Case No. 23 CR 54, United States of America v. David Lira.

THE COURT: Okay.

MR. HASTEN: Good morning, your Honor. Jared Hasten on behalf of the United States.

MS. VERMYLEN: And --

MR. CHERONIS: Good morning, your Honor. My name is Damon Cheronis, along with Ryan Levitt and Aubrea Drake. We represent David Lira, who is present.

THE COURT: Good morning.

Good morning, Mr. Lira. How are you doing today?

THE DEFENDANT: Good, your Honor. Thank you very much.

OFFICER KWONG: Good morning, your Honor. Kelly Kwong standing in for Jason Christiansen on behalf of the probation office.

THE COURT: Thanks. Thanks. I know you're stepping up kind of emergency basis, so thanks for coming in.

Okay. So, Mr. Cheronis, I'm first going to ask you if you've had a chance and time to review the presentence report

with your client.  I think you have.

MR. CHERONIS:  I have, your Honor.

THE COURT:  And I know there's a lot of disputes here. But without getting into the guidelines, I am to ask you first whether you have any corrections.  And you noted in one of your many filings that you have a correction at page 13-14, paragraph 40.  So I don't think that's maybe the most significant thing today, but can we deal with it first?

It's -- paragraph 40 is at the bottom of page 13, and your correction is actually on the next page.  But if I understand your correction -- do you know what I'm referring to?

MR. CHERONIS:  Just going to get to that page, Judge.

(Counsel conferring.)

THE COURT:  So it's the second-to-the-last paragraph -- I'm sorry -- second-to-the-last sentence.  And it really refers to the government's version, so I'm not sure you can object to it.  But I can note your --

MR. CHERONIS:  Sure.  I think we also said it's a fair statement that doesn't need correction, but we sort of expanded upon it.

THE COURT:  Okay.

MR. CHERONIS:  So we don't need any issues with the PSR changed.

THE COURT:  Okay.  All right.  So I've noted it for

the record.  You noted that -- it's the government's position that your client made sure those funds went to the referring fund -- the referring lawyer's trust account in order to prevent Mr. Girardi from stealing the funds.  Your position is that Mr. Lira assured that those funds went to the referring lawyers' accounts so that the referral fee could be paid to the -- to the referring attorney.

MR. CHERONIS:  Consistent with what the witness told the government, Mr. Koushan, yes.

THE COURT:  Okay.  But I'm not going to make any correction then to the presentence report.

MR. CHERONIS:  No.

THE COURT:  Okay.  Understood?

MR. HASTEN:  Understood, your Honor.

THE COURT:  Okay.  And do you have any corrections to the presentence report other than the guideline calculations? You didn't note any that I saw.

MR. HASTEN:  No, your Honor.

THE COURT:  Okay.  There's been so many filings, so much paper.  So if I miss something, please correct me because I've tried to take notes, but I very well could have missed something.  Okay, Mr. Hasten?

MR. HASTEN:  Yes, your Honor.

THE COURT:  All right.  I have some housekeeping.  I have two victim statements that you've sent to us via e-mail

from people who did not get paid in a timely manner from the air crash. And I have the Edelson statement, and I have a Lira response. And none of those things are on the record.

Do you -- what do you want to do about those? Do you want to just give them to the probation department and have them make them part of the record?

MR. CHERONIS: I think that's fine. That's for the PSR.

THE COURT: Okay. Done.

MR. HASTEN: That's fine, your Honor.

THE COURT: Okay. I want to understand -- because I've read so much. And I'm guessing defense will make this clear to me. But I want to understand the collateral consequences for Mr. Lira in terms of -- I know one letter said, oh, he's going to be thrown out of this bar association or something. And there were a lot of initials going around, and I wasn't sure what all those things were.

So if you can list those for me at some point. And maybe you're going to say it in your allocution, so I don't want to put the cart before the horse.

MR. CHERONIS: I will speak to those issues, Judge.

THE COURT: Okay.

MR. CHERONIS: And I did send your Honor --

THE COURT: I got that today.

MR. CHERONIS: Okay. I wasn't sure because I know

there was the issue about you not being here on Friday.

THE COURT: Okay. So I just -- those were my housekeepings.

MR. CHERONIS: Okay.

THE COURT: Okay. Any other corrections to the presentence report on behalf of the government?

MR. HASTEN: No, your Honor.

THE COURT: Anything else from Mr. Lira?

MR. CHERONIS: No, Judge.

THE COURT: Okay. So, Mr. Lira -- and please remain seated because it's going to be a long hearing.

And we have a feed here going out to people. I'm not sure why we have that or who's listening, but we have a feed.

MR. HASTEN: Your Honor, Septiana Damayanti is one of the victims in Jakarta. It's approximately 11:00 p.m. in Jakarta.

THE COURT: Okay.

MR. HASTEN: But she has called in. We have an interpreter on the line as well. So we thought given the unique circumstances of this case and Ms. Damayanti's role that she had a right to be here. The other victims, we provided this link to them, your Honor. But it's almost midnight out there. They have families. But I think that we wanted to acknowledge and recognize that she has called in to these proceedings.

THE COURT: Okay. Well, welcome. Glad to have you here.

Given the lateness of the hour, is that somebody I should hear from before it gets to be 1:00 a.m. out there? Because we've got a lot of guidelines to talk about, and I suspect that will take an hour or so. So is that something you want to front -- you know, do earlier, like now? Or how would you like to handle that?

MR. HASTEN: I think the way we would handle it, your Honor, is Ms. Damayanti provided a statement, which I can read later in the proceedings. But I just wanted to make sure that she was recognized here today and that if she needs to drop off because it's the middle of the night by the time we conclude, I wanted to make sure that she knows that we know that she's here and that she's doing a lot by being here.

THE COURT: Okay. Well, we appreciate the effort that you're making by being here. I see Mr. Lira's lawyer shaking his head. I know they appreciate you being here.

Apparently you've submitted a statement, which the prosecutor will read on your behalf. If you feel we should do that by, you know, noon so that it's only midnight there or anything like that, just let me know. I'm happy to adjust the schedule so that we know she's still on the line, however you want to handle that. Okay?

MR. HASTEN: Yes, your Honor.

THE COURT: All right. So Mr. Lira's an attorney, so he's sophisticated.

But just so you know, Mr. Lira, the guideline -- the sentencing law requires that the Court calculate the guidelines as a starting point. And probably there's more dispute on the guidelines in this case than I've ever seen because the parties don't even agree what the base guideline is. And I have not encountered that before. Even in my practice, I never encountered that.

So I feel like we should start with that because I feel like it's really at a -- I mean, I think it talks about the essence of the case, and I think until I make those decisions, I don't know really what else we would talk about.

So we know that the probation office -- of course, 2J1.1 is the guideline for contempt and directs us all to 2X5.1. I think we all agree on that. And from there, we're in disagreement, or the parties are in disagreement.

So probation office recommends that we go to 2J1.2. The defendant agrees with that. And the government recommends that we go to the fraud guideline at 2B1.1 for defrauding the air victims.

So I've read everything. Would you like to comment? Would -- maybe something brief from the government -- I mean from the defendant.

MR. LEVITT: Yes, Judge. Thank you. Very brief.

I heard in your prefatory remarks there's something about it being a sort of microcosm for the case how we're diverging, and then here it sort of gets baked into the base offense level -- right? -- where the government is taking this wider approach and we're saying it's this. I think it's interesting, and I had that same thought thinking about how it sort of played out here.

But at the end of the day, as the Seventh Circuit has stated, this is a purely legal analysis and we have a test before us. It's the elements-based approach that the government hasn't acknowledged in its brief even though it cited the *Betts* case. There's three elements: a reasonably specific court order, a violation, and that it's willful. The government agreed to dismiss the fraud counts. We made -- and expanded on the factual arguments much more. I know you don't need to hear about them right now in this point. It's in the papers. But Mr. Lira did, in fact, leave Girardi Keese. He did not have any personal gain.

When you look at the elements and apply the legal test to figure out what the base offense level is for this contempt -- excuse me -- contempt conviction, I don't think it's a particularly close call. We think it should be under 2J as we set forth in our papers. And I'll rest on that.

THE COURT: Okay.

MR. HASTEN: Your Honor, I want to first start -- I

want to direct the Court's attention to Title 18, United States Code, Section 3661.

The defense is trying to cabin this case into Mr. Lira's guilty plea to violating Judge Durkin's orders and saying nothing outside of that matters. That's wrong as a legal matter.

3661 says, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

The Court can hear evidence outside of the factual basis of the guilty plea. You can't ignore facts. You can't negotiate facts away. To talk about the specific guideline here, your Honor, the defense is saying that the elements-based approach means that a criminal contempt conviction, according to what they're saying, can never go to 2B1.1. And that's not what the guidelines say.

Application note 1 says, "In certain cases, the offense conduct will be sufficiently analogous to 2J1.2." Sometimes, not always. The *Betts* case dealt with the Anti-Riot Act. And the Seventh Circuit said all you have to have is this can be in the same ballpark, that somebody who violates the Anti-Riot Act could be on the hook for property damage, which is what happened here.

Application note 2 to the contempt violation -- Section 2J1.1, application note 2 -- gives an example of willful failure to pay child support. So you have a child support order telling a defendant you must pay child support, and then you don't do that.

The guidelines say in that case when you've got a court order instructing a defendant to pay money and the defendant doesn't do that that 2B1.1 applies. And that makes sense because, your Honor, if we always went to 2J1.2 in a contempt case based on theft of funds, based on money that was not paid, it's not going to necessarily take into account the seriousness of the offense. If it's a payment order of $10,000 or $1 million, it wouldn't necessarily matter.

And I understand the Seventh Circuit said in *Betts* you could look at the elements of the offense. I think you can still do that here, your Honor. You can look at the contempt elements, and you can arrive at the conclusion that a contempt conviction is in the same ballpark as the fraud guideline in 2B1.1.

But I want to go to the facts here, your Honor. And, again, these are facts that Judge Durkin found that cannot be negotiated away.

Number one, Mr. Lira knew from the start that Girardi did not pay clients when he was supposed to.

Number two, Mr. Lira was not surprised that

Mr. Girardi was lying to the clients.

Number three, it's undisputed that Mr. Lira accepted a salary from Girardi & Keese, knowing that the firm had not met its obligation to the clients.

Number four, it is not credible that Mr. Lira was so completely unaware of prior disputes over client payments that they had no suspicions of Mr. Girardi's conducts and motives.

Number five, and the last one --

THE COURT: Wait, wait, wait. Could you say number four again?

MR. HASTEN: It is not credible that Mr. Lira was so completely unaware of prior disputes over client payments that he had no suspicion of Girardi's conduct and motives.

Number five, it is difficult to believe that Lira was unaware that Girardi was running a Ponzi scheme with client money which, in fact, he was. And it was difficult to believe for Judge Durkin because that's exactly what was going on in this case, your Honor.

The defendant knew that that firm was having trouble paying clients, paying its bills, and like manna from heaven, they get the Boeing settlement money. It comes in. That doesn't get paid. They start lying to clients again. The defendant starts lying to clients.

He leaves the firm not because he was altruistic; he leaves the firm because he wants to get out of there. He knows

it's a sinking ship. He calls Girardi a thief. He doubles down. He lies to Judge Durkin numerous times.

Your Honor, I'm going to get -- this is going to be my 3553 argument, but these facts put this in the case of a 2B1.1 case. This is theft; this is fraud. That's why the government's position here is that 2B1.1 should be the base offense level.

THE COURT: Okay. But he -- I'm trying to understand this because it's complicated what happened. And I've read the transcript in front of Judge Durkin. And -- of Mr. Lira's testimony. And I agree he wasn't -- he wasn't candid with Judge Durkin. And -- about either past clients, what happened with past clients, and how the Lion Air clients were treated.

I know there's confusion about the letters to the Lion Air clients and which one was attached to which e-mail that went to Mr. Lira and, you know, which one went out to the client and which one didn't, you know. And I know Judge Durkin I think at one point called the lies in there whoppers, and they were. I mean, they were ridiculous lies about the tax consequences and how hard Mr. Girardi was working, talking to the head of the IRS, et cetera.

But I'm trying to understand -- I mean, there's no -- you don't think that Mr. Lira stole any money or was part of any thieving. I mean, what was happening here was kind of a classic Ponzi -- right? -- robbing Peter to pay Paul. When the

14

next money would come in, they would pay the client who didn't get paid, or Girardi would pay the client who didn't get paid.

But Mr. Lira wasn't engaging in that conduct.

MR. HASTEN: He facilitated it, your Honor. He lied to the clients to cover for Mr. Girardi. This doesn't work without him doing that.

THE COURT: Well, okay. So that's a bridge I'm not sure I understand. So I understand the contempt, right? Because what he should have done was either -- and you get this from Judge Durkin's transcript loud and clear, that he should have told the clients the truth. In fact, I think Judge Durkin calls it a Rubicon moment. And he should have called the Court, right?

MR. HASTEN: Absolutely.

THE COURT: That's the contempt of court.

So in March or April or whatever -- we can all -- we can bicker about the date, the earliest date at which that should have happened. And defense counsel makes some fuss about, you know, when the Edelson firm should have done it.

But at an earlier date, certainly an earlier date, Mr. Lira should have reached out to the Court, either an e-mail, a phone call, or a motion, and said, "Hey, we've got trouble here." And that's the contempt. That's -- I understand that.

But that seems like a 2J offense. So what I'm -- the

elements and all that. Doesn't have anything to do with the amount of the money. Could have been a $10 million fraud; could have been a $1,000 fraud; could have been -- whatever it was. The conduct -- you know, defendants keep saying he should have done more; he should have done more.

And it's not that he should have held a gun to Girardi's head and said, "Pay the money now," or he should have stolen the trust account checkbook and sent the money himself. Those things I think felt impossible because of the way -- apparently the way Girardi ran his firm. But what he should have done is reached out to the Court.

What's contempt -- what's contemptuous is that a Court had entered an order, and he didn't do anything to follow the order. He didn't go to the Court and say, "Hey, you've got this order, and it's being violated." But that's contempt.

So I'm trying to understand how does that -- how does that translate into fraud? And I know you want to take into account the seriousness of it by getting it into a loss table. I understand the 2B consequences.

But why is that conduct fraud? I mean, it seems to me that these people eventually get paid, or at least in the past they have eventually gotten paid. And I have a list of some of these victims who in the past -- I mean, we had one guy's grandfather had to call to get him paid. I mean, I've looked at all these documents. But they get paid, which often happens

in Ponzi schemes, until the house falls down.

So that's what I'm trying to understand in terms of picking the proper guideline range.

MR. HASTEN: I think, your Honor, that is all accurate.

But what your Honor's analysis didn't take into account are e-mails from April 20th, 2020, and April 22nd, 2020 --

THE COURT: Okay.

MR. HASTEN: -- where David Lira is directly e-mailing the victim clients himself and making excuses. And he's lying to them, saying, "You're not getting paid because of the pandemic." And that's a false statement. That is not true. That had nothing to do with it.

Mr. Lira at that point is covering for Mr. Girardi because he knows that Girardi is not paying his clients on time. So that's an affirmative step there. That is a lie to the clients. And he does it twice.

And then we can talk about the fake Girardi letters that go out a month later that Mr. Lira doesn't write them, but they go out under -- after he reviews them, he indicates they're okay. He then walks that back a couple minutes later.

But I want to focus on the April e-mails because those are the direct communications by Mr. Lira to the victim clients. That facilitates the Girardi fraud scheme because

without those communications -- if he would have said, "You're my clients. Look. This is what's going on. Tom stole money before. This is what he does. He runs a Ponzi scheme. You're going to get paid, but we use your money to pay our bills. We use your money to pay our salaries, to pay our AMEX bills." He's not doing that. He's covering for Mr. Girardi again.

And this is what Judge Durkin found troubling in that Mr. Lira is lying to the victim clients to protect Mr. Girardi. And this is where Judge Durkin said, "I just don't find this credible that nobody knew what was going on in this law firm."

And Mr. Girardi can't do this by himself. He needs other people to do it. That's why this law firm was in existence for so long. That's why it didn't collapse. It's e-mails like that. It's people like that. It's Mr. Lira knowing what was going on and covering for Girardi.

THE COURT: Okay.

MR. LEVITT: If I could, Judge. I'm going to start --

THE COURT: Sure.

MR. LEVITT: I want to start my response by pointing out that as we stand here now, you still have not heard an argument under the applicable legal standard here. I mean, Mr. Hasten keeps using the word that Lira "facilitated" Girardi's fraud scheme, "facilitated" being the operative word there. If we go back to the elements-based approach, though, we know 1341 and 1343 and every other fraud statute has in it

an intent-to-defraud element, not facilitate other people's fraud, but you have to act with the intent to defraud and to cheat other people out of money or property. Mr. Lira got no gain.

And he didn't -- we completely disagree about his departure from Girardi Keese and the implications of that and whether it's mitigating or aggravating. Certainly confronting your father-in-law on the way out the door and blowing up that relationship and calling him a thief in the hopes that he pays the client as he did on other times as witnesses reported, employees of Girardi & Keese, that David and Tom got in heated conversations inside Girardi & Keese.

And I assure you that wasn't so that one day one of these other attorneys would one day be telling the FBI and it would wind up in a 302 that Mr. Lira could refer to here today. He did it because he was not a part of the fraud scheme. We didn't plead to that for good reason. There certainly were problems and issues, and Mr. Cheronis will get more in the facts and the nuance that we have about that. But --

THE COURT: Okay. But what about the government's argument that you would never be able to jump to fraud from a contempt charge, which the guidelines clearly contemplate, if we only had to look at the elements? I mean, that -- you know, *Betts* -- is it *Betts* or *Best*?

MR. LEVITT: *Betts*, B-E-T-T-S.

THE COURT: *Betts*, right. So I read it. But if -- and I know it's an anti-riot. You know, it's a different context.

But how do we address that?

MR. LEVITT: I did mean to hit that. That was a misstatement of our position that we think you can never use 2B for a contempt case.

For example, in this very case, if Tom Girardi was charged with contempt, he would -- he would -- his would fall under the 2B guidelines most likely because he, in fact, stole money and acted with an intent to defraud. And when you look at the elements versus his conduct and everything applicable, it would -- it would fit in that situation.

The general rule is that -- and that's -- our position is that the general rule, as the guidelines say plainly, is that it should be under the 2J chapter. There are other exceptional situations. However, it's going to be the minority per the guidelines that you would go to 2B where in other situations you could certainly wind up going to other places or other offense chapters.

THE COURT: So is it only when the defendant's obstruction goes to the defendant, you know, benefiting, the defendant -- so the defendant sells the boat out from under the order that says, you know, "Don't sell any of your assets," or, you know, the defendant him- or herself violating a court order

that restrains the defendant's assets or the Mr. Girardi example?

MR. LEVITT: Yeah, I think that's certainly a part of the analysis. But, again, at the end of the day, it's a purely legal approach that in *Betts* they said it's going to be subject -- subject to *de novo* review because it is a purely legal approach and there are no facts to be found. And it's appropriate for *de novo* review because you look at the elements in the charging document and what's in there.

And, yes, in those situations where if it's Tom Girardi and there's no question, his contempt is stealing the funds subject to the settlement order. That sounds in fraud and is, in fact, fraud and is going to fall under the fraud guideline.

Someone who just didn't do enough and -- you know, there's a lot of nuance to the characterization about the lie letters. And even a lot of that discussion you heard from the government was things Girardi did, not David Lira. There was a number of time Mr. Hasten said, "They did this," "They did this," "They did this." We're not here on a conviction on the fraud counts. We're here on the contempt counts, arguing about that one.

THE COURT: I understand that. But what about -- I mean, the focus of Mr. Hasten is the April, the two April 2020 -- I think they're e-mails, not letters -- but the

April e-mails directly to the Lion Air clients. Those are -- those are -- they don't contain whoppers, potentially, as described by Judge Durkin, but they are direct communications from Mr. Lira to the clients. And so they're more troubling in that regard.

MR. CHERONIS: Judge, I'll jump into that, if I could, with Mr. Levitt's agreement. First, I just -- on a broader view, I want to talk a little bit how this case was resolved because I think it's important to this issue. Okay?

You've read the plea agreement in this case. That did not come overnight. The government -- we were ready for trial. The government and I got into plea negotiations. And there was information in that plea agreement which talked to the count of conviction that Mr. Lira pled guilty to.

In that plea agreement, the government agreed to language that David Lira attempted to get the clients paid, that he called Tom Girardi a thief, that he forwarded e-mails to him to ensure that they were paid.

Moreover, regarding those letters, the first letter is important because he does say, Mr. Lira -- he doesn't say, "We don't have the money." He does mention COVID, but he said, "It's on Tom's to-do list." That's what he tells the government.

The second letter, he does talk about the government shutdown, and I understand that. None of that was done with

the intent to defraud them. And they are again conflating these issues. It is not -- even if you say something that might not be a hundred percent accurate, that does not mean it is done with the intent to defraud.

In other words, in this situation -- and I've talked to the government about this, you know, in other situations. They know as to David Lira this case is not about greed. They know he didn't make any money. They also know he was contemptuous of his conduct.

For them to pick and choose these e-mails, they have to show that not only was that done for a singular purpose but with the intent to defraud them. That cannot coexist with him trying to get these individuals paid, which the government would be hard-pressed to argue that he wasn't trying to do.

At the end of the day, he failed in that regard, clearly. But they want to have it all. Then they shouldn't have offered this plea agreement, I might add. They shouldn't have offered a plea agreement that took out the fraud charges, but they did. And they did that, and we are glad that they did, right?

But at the end of the day, they know that he didn't get any money from this. They know that he didn't try to make any money from this. They know that he didn't steal any money. What he did was find himself in a horrible situation.

THE COURT: Okay. But -- I know you're a very

aggressive advocate, and I appreciate that.

But I'm not limited -- and I'm not even supposed to just sentence -- I mean, I've read this plea agreement seven times this weekend, which I don't normally do for a sentencing. But I'm not limited to what somebody pleads to. I mean, I'm supposed to take into account the conduct.

MR. CHERONIS: Sure.

THE COURT: And this is a complex case. And so, you know, the fact that you very deftly negotiated --

I'm talking. I'm talking.

MR. LEVITT: I'm sorry, Judge.

MR. CHERONIS: I apologize. I put my hand up.

THE COURT: Okay. So I don't -- I mean, it's -- legally it's not sound for me to say, "Well, this is what he pled to, so I have to ignore the fact that he sent some e-mails." I mean, I don't know -- you know, we take into account acquitted conduct, for instance. Now, you might find that abhorrent. You might think --

MR. CHERONIS: No.

THE COURT: -- that's okay. I don't know. But you're -- I feel like it's too narrow of a focus.

MR. CHERONIS: But I don't know if I'm disagreeing with you, Judge, and I think there's a proper way to do that. And that's not under this guideline; it's under 3553(a). You're absolutely entitled to look at that and weigh that for

what you believe it's worth.

And, you know, I think it's the second time in this case you've called me aggressive. I don't mean to be. I believe strongly in some of these arguments, and to the extent that you think I'm being overly aggressive, I apologize.

But I will say there is a time and there is a place for that argument which the government will make. But when you look at the *Betts* decision and you look at an analysis that is an elements-based approach, that doesn't mean the book is shut. That doesn't mean you don't get to deal with that in its proper forum. It means under we believe existing Seventh Circuit laws, the Seventh Circuit law, you can then say, "Okay, Mr. Cheronis. We agree with you on this point, but I'm not going to forget about this." And I think that's the proper way to do it.

And I don't mean to sound like it's in a vacuum or should be disregarded. This is an issue about what potential, you know, guideline applies.

And I think Mr. Levitt might want to add one thing, Judge.

MR. LEVITT: I think you mostly covered it.

I was going to say we're just talking about the base offense level here. And the analysis under the base offense level, going to the 2X chapter, looking at 2J, is to look at the offense of conviction. Of course later when we get to

3553(a)(1), the history -- or excuse me -- the nature and circumstances of the offense, all of this stuff is relevant and fair game to discuss.

But it's -- we have to stick to the legal standard that applies here. I wish we could disregard it more as a defense lawyer, but we can't. We're stuck with it. And for the reasons we talked about, we think this is a situation where the contempt guideline absolutely should control.

THE COURT: Anything else?

MR. HASTEN: Your Honor, unless you have any questions specifically for me, I have nothing else aside from what's in our brief and what we've argued here today.

THE COURT: And no response to what they have to say?

MR. HASTEN: Your Honor, at this point I think it's all been covered by our brief. I would disagree with the characterization of Mr. Lira's conduct here. I think it's minimizing it, as they've done throughout, but I will address that later on.

THE COURT: Okay. All right. Well, I think you're presenting very complicated arguments, and I appreciate the way you've presented them.

I do think -- and I appreciate your pointing out *U.S. v. Betts* because I had not been aware of it prior to this.

I do think based upon the elements -- and I'm just going to pull those up. I have them here -- a contempt of

court -- the elements are that the Court enters a reasonably specific order -- I have no doubt that Judge Durkin did that. We've all looked at these orders. I think there were four of them -- that the defendant violated the order -- and I think we'll talk more about that as the morning moves on -- and that the violation of the order was willful. I don't think there's any doubt about that.

But I think that if you look at those elements and you look at Mr. Lira's conduct with respect to the offense that he committed here, the order required the distribution of money, and he knew that Girardi was not paying the victims the money that they were entitled to. And he did not take actions. He didn't alert the Court. He didn't tell the clients. He didn't tell his local counsel, his co-counsel, about it. Most importantly, he didn't alert the Court.

And I think those -- that conduct does fall, as the probation office found, under 2J1.2 as obstruction, relying both on *Betts* and, frankly, on *Tankersley*, T-A-N-K-E-R-S-L-E-Y, which also applied 2J1.2 to a contempt offense. So I'm going to start there.

Now, from there, as a most analogous guideline, the probation office recommends an enhancement of three points under 2J1.2(b)(2), which is substantial interference with the administration of justice. And defendant objects to that enhancement. The government believes it applies.

Do either of you want to be heard on that?

MR. LEVITT: If -- I'll start for the defense, if I could, Judge.

Just briefly, I just want to be clear. You know, we said a lot on the papers. This is a legal argument. This is not that it wasn't a big deal or unserious or anything of the sort. But when you look at, again, what constitutes substantial interference with the administration of justice, under Section 2J, there's a but-for standard that a lot of courts have used. The Seventh Circuit hasn't formally approved it or criticized it.

We think it's -- whether you want to apply it directly or just consider it in all other relevant variables, it's a situation where under the law and as applied to the facts of this case, there was not substantial interference with justice because just about everyone the government wanted to indict in fact got indicted and have been convicted and prosecuted.

The only point in the application note that the government relies on is the resource expenditure provision where there's a significant enough expenditure of government resources that triggers it. Certainly there were resources expended. You know, I -- I note contempt does vary widely, and hearings and the way contempt comes to light and the consequences it has also vary widely.

I think generally it does involve court hearings, this

one probably longer than most. But at the same time, our point is not that it wasn't serious but that there was other conduct at issue, and significant other conduct at issue: Tom Girardi's other fraud scheme, Chris Kamon's embezzlement scheme. Even the past clients were charged separately in California with the Ponzi scheme we were talking about, that David Lira was not.

And on this point I want to say too, as we've started to talk about, a big part of David's conduct that he very much regrets is not doing something sooner than he had. And that goes to definitely the core of the contemptuous conduct here. And even if he had reported this in whatever the -- whatever we want to say the date is, April, May, somewhere in that general vicinity, if he had filed the motion to show cause then, there still would have been a two-day evidentiary hearing, I'm fairly certain.

I don't have a crystal ball, but with everything else going on, with the embezzlement scheme with the past clients and all of Girardi's other shenanigans, there -- David Lira was not the but-for cause in that sense of that resource expenditure. That's why we're saying it's not a substantial interference with the administration of justice and are asking the Court to decline to apply this enhancement.

MR. HASTEN: Your Honor, I respectfully disagree with the recitation of those facts. This enhancement applies when there are an unnecessary expenditure of court resources. I

believe that when a lawyer lies to a judge and a hearing results as a result, there is absolutely a but-for cause for the unnecessary expenditure of court resources.

That's what happened here. On December 14th, 2021, Judge Durkin held a hearing after the Edelson firm brought to light the fact that Girardi Keese had not paid these clients. David Lira lied to Judge Durkin. David Lira told Judge Durkin that he had no idea when the four settlements at issue, the four court orders here that gave rise to the contempt convictions, had funded. That was a bald-faced lie.

Judge Durkin then spent nearly a year sifting through court filings just with respect to this case, your Honor, not the California case, what happened here. He holds a three-day evidentiary hearing in December 2021. The defendant knew at that point that he couldn't continue that lie because there's e-mails. There's all sorts of correspondence showing that he knew exactly what was going on with these clients, the e-mails that I referenced earlier, your Honor, where he's talking to them, lying for Girardi about why the money hasn't been paid.

And then Judge Durkin has to have a three-day hearing in December 2021 to figure out who knew what when with respect to these clients and why they hadn't been paid. Mr. Lira doubled down again and lied at that hearing. Judge Durkin asked him, "Did you know of any other instances where Girardi was lying to clients?" The defendant lied again. He was also

asked at that hearing, "Do you know of any other delays in payments to clients?" He lies again.

Judge Durkin has to sift through all of this evidence, and then he writes an opinion almost 11 months later. Your Honor, that is almost between March of 2020 to November of 2022 when Judge Durkin writes an opinion on what happened here. That is a tremendous expenditure of court resources.

And this was just a subset of cases that was consolidated before Judge Durkin. Judge Durkin had the Lion Air case that happened off the coast of Indonesia. Judge Alonso has the one that's in -- off the -- in Ethiopia. But this was a massive consolidated case, with other cases that are set for trial. There were bellwether cases. And he's trying to manage all of this.

And then he's got this outlier case because he's got this fraud of a firm with Girardi Keese that didn't pay the clients. And they took the settlement money for those clients, and he has to have an evidentiary hearing where he's got lawyers coming in and lying to him. That's the epitome of an unnecessary expenditure of court resources.

Lawyers lying to judges, your Honor, that cause hearings, briefing, all sorts of things like that that would not have happened had the lawyer raised their hand and been honest, your Honor, warrant this application -- excuse me -- this enhancement. And the government believes that the

probation department got it right.

THE COURT: Yeah, I don't really think there's much debate here. I think Judge -- I think Mr. Lira's lack of candor in front of Judge Durkin was a but-for cause. I understand there may have been other but-for causes. I understand there's another gentleman who's since been charged, which also might have contributed to it.

But there certainly was an unnecessary expenditure of resources. You just look at the docket in the Lion Air case and you can see it because it's several docket entries. And of course there was a three-day hearing. And then there's a court order that comes out of it, and there's subsequent briefing.

And obviously Judge Durkin had to spend time sorting through those documents and those docket entries and ultimately issue an opinion in it. And there's no -- there's no doubt that it was a substantial interference in the administration of justice and a wholly unnecessary one.

And while I don't think that -- I know that Mr. Lira wasn't the only person to cause that unnecessary expenditure, he certainly was one of the people. And I think that that would qualify him under the but-for standard. And certainly had he done the right thing earlier, it could have and I imagine would have truncated some of that expenditure of resources.

Did you have something to add, Mr. Hasten?

MR. HASTEN:  No, your Honor.

THE COURT:  So I'll apply the three-point enhancement.

Now, there's a question of abuse of position of trust and a minor role.  Am I understanding that correctly?

MR. LEVITT:  Correct.  We are asking for minor role.  The government is asking for abuse of trust.

THE COURT:  Okay.  So why don't we move to minor role.

MR. LEVITT:  Yeah.  I don't have particularly additional argument unless your Honor had specific questions.

The only thing I would say at this point is the government again really bases a lot of their argument on these claims that Lira facilitated it; he was an indispensable member of this; but, you know, as we just talked about, without him, it wouldn't have worked.

The guidelines and the application note expressly state that the fact that a defendant performs an essential role in a given criminal conduct is not dispositive.  You have to look at factors like the degree of participation and their role in planning, their decision-making authority, how much they stood to personally benefit from it.

And on balance, looking at all of the relevant factors -- and I do think, by the way, this is one you can consider a wider view of the case on.  For the reasons we've argued, I think Mr. Lira does in comparison to Tom Girardi and others fit the minor role enhance -- or reduction.

THE COURT: Mm-hmm.

MR. HASTEN: Your Honor, if you're going to go with them saying you can consider all the facts --

THE COURT: Right. See, this is my struggle here is --

MR. HASTEN: It's what's good for the goose is good for the gander.

THE COURT: Well, so if he was being sentenced for a fraud, then I would -- and he was up at whatever that guideline range was -- I don't know, 20 or something -- then I would understand, of course, that he had a minor role to play with respect to that amount of money, and we would all know that he didn't get any of that money and he wasn't the person who had the power over the wire -- the ability to wire the people the money and he was back at the office trying to get Mr. Girardi to wire the money. And so I could see the minor role playing a role there.

But I don't see it as applicable when we're looking at did a lawyer follow an order. There's an order. There's four orders. You're supposed to follow it. You chose every day not to follow it. So you either did it -- you either followed it or you didn't follow it. And there's kind of not a degree of roles in that context.

MR. LEVITT: I agree that's a relevant point, your Honor. And my point was not to say we want it this way here

and we want it that way there.

On the base offense level, it's because the Seventh Circuit has said this is what you do, we were saying that is what you do. You just look at the elements. There is no such law under 3B1.2. You can consider relevant conduct, and 3661 does, in fact, not cabin the way information and facts are considered here.

But I take your Honor's point. We made -- even in the course of looking at the trust account specifically and the contempt and the ability to comply with that court order to disburse the funds, as the government has argued in court, you know, in the course of the Girardi California trial, it was him and him alone who had that authority. Nobody else could tell him what to do. Over -- you know, we've cited those over and over.

It's -- even just looking at the contempt, I think that's a relevant point to say yes, that's what we're talking about here. But looking at those wider facts and the fact of who controlled the wires and David's relative role and decision-making authority and all of that again, that's where our view of the facts shakes out. We're not disagreeing on the law here.

THE COURT: Okay. So I'm not going to apply the mitigation role or minor role under 3B1.2(b) relative to the contempt offense and under 2J1.2.

Okay. So there's abuse of position -- abuse of a position of trust, which is 3B1.3. And you're seeking that under --

MR. HASTEN: We're seeking that, your Honor. The probation department's point here was that the court system itself is necessarily the -- I don't want to say the victim, but that's what contemptuous conduct impacts so that there couldn't necessarily be a victim adjustment.

THE COURT: Uh-huh.

MR. HASTEN: I think that's just incorrect in light of Seventh Circuit precedent, citing *United States v. Cruz*, that specifically Seventh Circuit has said that you can have abuse of trust when, you know, the victim of the offense may not necessarily have been the person that you're -- or the entity that you're seeking to apply the enhancement for but were necessarily impacted by the commission of the offense, the concealment of the offense.

And I think that that absolutely applies here because every day that the defendant did not comply with those court orders, these people weren't getting paid. And these people, the victims, were the defendant's clients.

And, your Honor, I'll rest on what I've said in my papers unless your Honor has any specific questions. But I think this is a case where this enhancement certainly should be applied. And there's nothing about applying the 2J1.2 base

offense level that prohibits the Court from including victim-related enhancements in Chapter 3.

MR. LEVITT: Again, you know, I just would want to add, Judge, the government didn't talk about the fact that as part of this -- as part of this enhancement or adjustment, you have to use your skill and capacity in the position of trust. There's no, again, argument that David and vis-à-vis these clients isn't in a position of authority and they're looking to him for guidance and things of that nature. But when we're talking about this enhancement, the legal analysis requires you to use your special skill to further the crime.

David Lira confronted Tom Girardi. He insulted him. He endeavored to get the clients paid. He also wrote those e-mails and -- or at least some of them and didn't do enough, as we've talked about. But on balance, when we're talking about affirmatively using your special skill within the meaning of this guideline, it shouldn't apply and the government hasn't sustained its burden.

THE COURT: Okay. So his special skill, obviously, he's got licensing as a lawyer and he's got a position of trust. I actually think he did use his special skill with respect to contempt because he's exactly -- it's -- he is who he is. And because of who he is, is why I assume he was called to testify. I don't know exactly how that came to be that Judge Durkin -- I don't know how that happened.

MR. LEVITT: I can mention just from the transcript --

THE COURT: Yeah.

MR. LEVITT: -- that it was Edelson. There was a discussion back and forth about who is necessary.

THE COURT: Right.

MR. LEVITT: And I think Judge Durkin might have said something like, "Okay. Well, certainly Tom Girardi," and asked anybody else. And that's when Edelson chimed in, "We definitely think David Lira and Keith Griffin should also testify."

THE COURT: Right.

MR. LEVITT: So that -- and then there was some deference -- or I don't want to say agreement -- I don't know. That was a general sense of how I think it unfolded.

THE COURT: And my guess is because they had appearances. So they didn't call, for instance, some paralegal from Girardi & Keese -- or "KESS," right? They didn't call some first-year associate. They called somebody who had some knowledge and some longevity with the firm.

And so to me, you know, Judge Durkin -- the justice system would not rely on a one-year associate. They wanted to hear from a partner. I understand there's a little dispute about whether -- you know, how much power he had, and I understand he didn't have the power over the IOLTA account or to send wires from that account.

But he was a person with knowledge. He was certainly a person who had duty of candor. And he was the person who went and -- went under oath and was not truthful with the judge. And so I think that that makes him a person of trust and that he abused that position of trust.

I'm not even talking about getting the people paid. I'm talking about contempt. So I'm going to apply the two points.

Are there other disputes?

MR. HASTEN: Your Honor, we also asked for the vulnerable victim enhancement in Guidelines Section 3A1.1(b)(1), namely, that the defendant knew or should have known that a victim of the offense was a vulnerable victim.

Here the clients were the vulnerable victims. They were not United States citizens. They relied on Mr. Lira as their lawyer to negotiate a settlement and represent their interests. They had lost loved ones. In many cases, they had lost spouses who were members of the judiciary in Indonesia, and they trusted these lawyers, including the defendant, to advocate for their interests.

And I'll say even focused on the contempt offense here too, every day that these funds didn't get paid, the defendant knew that he was abusing the trust that he placed in these -- or that these individuals placed in him, that they were

vulnerable victims.

And I'll go back to the lies that he told them in April as well too where he was covering for the reason for the delay in the payment. The probation department did not recommend this, again, I think too narrowly looking at the offense being focused on the Court here. I think this for the same reasons that the abuse-of-trust enhancement applies, the vulnerable victim applies here too.

Your Honor, at base, he was their lawyer. They lived 10,000 miles away. They had just lost loved ones in the worst possible way, and he didn't do anything to help them.

THE COURT: I don't -- I guess I was kind of looking at this as the fraud. I mean, there's no doubt that they would be vulnerable victims under a fraud, and I think we dealt with this in Mr. Kamon's.

MR. HASTEN: And Mr. Kamon, to his credit, admitted to that.

THE COURT: Oh, okay. So we weren't disputing that.

Okay. So this is a little different. And I don't know if I read your response because -- I mean, I certainly read it, but I don't know if you were -- I was dealing with this more as it's a fraud issue. And so I don't know that I really thought through this as applied in the obstruction context. So maybe you can address that.

MR. HASTEN: Your Honor, I think it's both, but I

think it also applies in the larger context here, knowing what Mr. Girardi's doing. He knows that these are vulnerable victims. He knows that Girardi is not paying them. He's lying to them.

But also on the contempt, if you're just going to look at the violating the court orders --

THE COURT: Right.

MR. HASTEN: -- he knows that this is impacting them because they're telling them. They're writing to them, "We need this money, and you're not paying it to us." And he knows that that's not happening because Girardi is taking it, but he also isn't doing anything. He's on the hook for those orders too.

THE COURT: Right. I guess I'm focused on him lying to the Court. So I guess I'm kind of trying to -- let me get to that. It's 3B what?

MR. HASTEN: It's 3A1.1(b)(1).

THE COURT: 3A. Okay. Yeah, thank you. Okay.

MR. LEVITT: And I want to pass the baton, if I could, to Mr. Cheronis about I think the Kamon comment, the comparison that you just heard. I will, as your Honor is looking it up, refer you to application note 2, which contrary to what the government thinks we should do, application note 2 just tells us that "vulnerable victim" is, quote, "a person who is a victim of the offense of conviction and any conduct for which

the defendant is accountable under Section 1B1.3."

Do you want to address that?

MR. CHERONIS: Judge, I just want to raise a fact. I read Mr. Kamon's sentencing transcript. And, you know, the government says to his credit, he admitted that. And I told Mr. Hasten this. We are saying it doesn't apply. We are not saying that these people weren't victimized.

THE COURT: Right.

MR. CHERONIS: Period.

THE COURT: Right.

MR. CHERONIS: And for him to throw that fat in there is -- I take exception to it because I spoke to him about it, and I said, "We are saying under the law, the exception doesn't apply, or the enhancement. And the judge is certainly able to take that into account under 3553(a)."

And I think in my response motion, I made it very clear that Mr. Lira understands what happened to these people. And you'll notice I didn't write a response to their victim impact statements like I did for other people. So we get it. And we understand that this cannot be looked at in a vacuum.

And I don't give anything to Mr. Kamon's credit, respectfully, but I will say this, Judge. It should certainly be looked at under 3553(a). We'd expect you to do that. I've read those letters. Those letters are significant. They're no joke. And Mr. Lira gets it. He understands that.

But we're in a courtroom, right? The law certainly matters, and we are saying as a matter of law this doesn't apply, and your Honor is free to look at it under 3553(a).

THE COURT: And can you talk to me about why it doesn't apply? Does it not apply -- I mean, it obviously applies to who they are, and we don't have to talk about that.

But is it not applying, in your view, because it's contempt?

MR. CHERONIS: That's part of it. All right? The offense of contempt is sort of -- it's a crime against the Court, right?

THE COURT: Yeah.

MR. CHERONIS: Which we understand.

And, again, you know, I'm not going to get into all the back-channeling that went on in this case, but there was a lot. He's taken full responsibility for that, and he's not saying those other people weren't affected. But if we're looking at the offense here -- and we keep going back between fraud and contempt and all of this stuff, and I get it -- and there's a place for that, just not here -- that as probation said, you know, the victim is, you know, the Court.

And, Judge, how many drug cases have you handled where it says, "There's no victim in this case"? You know, probation comes back and says, "There's no victim in this case." But most judges when we're talking about fentanyl or heroin or

whatever say, "Okay. Yeah, I get it. But people were actually hurt from this."

And that's what we're saying. We're not trying to disparage these Lion Air families who lost not only their loved ones but lost more than that. We get it. But it's not appropriate under the enhancement the government is asking for.

MR. HASTEN: I respectfully disagree. That's in contravention of Seventh Circuit law, your Honor. *United States v. Cruz*: "A vulnerable victim enhancement may apply where the vulnerable victim was not the offense" -- "the victim of the offense of conviction but was harmed by the conduct involved in the commission of that offense." That's exactly what happened here, your Honor.

THE COURT: What's the facts of *Cruz*?

MR. HASTEN: The facts of *Cruz* were that --

THE COURT: You know, roughly.

MR. HASTEN: Roughly. I've read a lot of cases, your Honor. Give me a second.

That was somebody who stole money from their employer and committed bank fraud. So the victim there was the bank, the financial institution that expended funds, but the actual person that was -- the entity that was out of money was the employer. The Court looked at that and said, okay. Here. It's like a health care fraud case where you have, like, the program -- the insurer, Medicare or BlueCross, is the person

that was out of money, but there are victims in the offense, the patients. There it was the money that was stolen from an employer.

The Court there said, "Of course you can look at that. There's a vulnerable victim there that's part of the offense." And the Seventh Circuit affirmed in *Cruz* and said that.

THE COURT: You mean the patients were the vulnerable victims?

MR. HASTEN: In the case, in *Cruz*, it was an abuse of trust that was imposed based on the fact that the employer was out of money, and the person who stole the money had a position of responsibility with the entity. But the Seventh Circuit also said that would apply in the context of vulnerable victims.

And I can read it, the statement, again too. "A vulnerable victim enhancement may apply where the vulnerable victim was not the offense of conviction but was harmed by conduct involved in the commission of that offense."

THE COURT: But they didn't give the vulnerable victim there.

MR. HASTEN: They compared it to abuse of trust. But the Seventh Circuit has said that.

THE COURT: I see. I see. Okay.

Well, it's certainly new, and I trust from all Mr. Lira's letters and long experience that he knew how

vulnerable the victims were. And I don't think anyone's disputing that. The challenge is linking it to the contemptuous conduct.

I'm going to apply the two points. But I'm going to take that into account in the 3553 factors as well.

Do we have other disputes? I mean, we have acceptance. I know that.

MR. HASTEN: Acceptance, your Honor. With that enhancement, the defendant is ineligible for zero-point offender relief under 4C1.1(a)(9).

THE COURT: Oh, is that why you left that off of your calculation?

MR. HASTEN: That one?

THE COURT: Yeah. You left off the zero-point offender.

MR. HASTEN: I did, your Honor, and that was the reason for that. I noted in our initial sentencing memo that those two applications kind of work in tandem -- or not in tandem, but the effect of one negates the other.

THE COURT: Okay. So let's go through the guidelines.

It's a Level 14. There's plus three for substantial interference under 2J1.2(b)(2). There's plus two for vulnerable victim, 3A1.1(b). There's plus two for abuse of position of trust, 3B1.3.

Is that 21?

MR. HASTEN: Yes, your Honor.

THE COURT: There's minus three for acceptance under 3E1.1(a) and (b).

Anything else?

MR. HASTEN: No, your Honor.

THE COURT: Anything from defendant?

MR. LEVITT: No, Judge.

THE COURT: Are you checking the math?

MR. LEVITT: I'm just double-checking Level 18 against Criminal History I. I was following you, and I agree with your math as you stated.

THE COURT: So it's Level 18.

MR. LEVITT: Correct. That's my calculation.

MR. HASTEN: Yes, your Honor.

THE COURT: So 27 to 33.

MR. HASTEN: I believe it's 30 to 37.

THE COURT: Okay. I got that wrong.

MR. LEVITT: I'm just Googling it.

MR. HASTEN: Sorry, your Honor. It's 27 to 33.

THE COURT: Okay.

MR. HASTEN: I misspoke.

THE COURT: Okay.

All right. Mr. Lira, once we calculate the guidelines, we move on and we talk about the 3553(a) factors.

The guidelines are a starting point. I'm to take into

account the seriousness of the offense, you and your background to try to come up with a sentence that promotes respect for the law, that deters you from committing future offenses, that deters other people from committing offenses like this, that tries to sentence people who commit offenses like this equally, so cuts down on disparities in sentences. Those are big ideas we try to capture in one sentence.

So I've read so many letters that people have sent on your behalf which are really incredible. I'm sure the ones from your kids you've put somewhere special because they're really quite moving, and then there are several from colleagues.

And then I've heard, obviously, from the two victims, the Lion Air victims. And I'm aware that you had four separate Lion Air victims that were paid on time with a different outside counsel whose name I don't remember, but I appreciate that, and I'm aware of that happening.

Okay. So how would you like to proceed? Would you like to go first?

MR. HASTEN: Your Honor --

THE COURT: And would this be a time to hear from the victim statement that you're going to read? Because it's now midnight.

MR. HASTEN: I can't --

(Counsel conferring.)

MR. HASTEN: Sure, your Honor. Both victims have asked me to read the statements.

THE COURT: The ones I already got?

MR. HASTEN: Yes.

THE COURT: Oh, okay.

MR. HASTEN: I can do this now. I'm not sure if Ms. Damayanti is still on the line.

MR. CHERONIS: I don't think so, but I don't want to speak for her. I saw her name on the far right earlier.

THE CLERK: She's still on.

MR. HASTEN: She's still on the line.

Your Honor, this is a victim impact statement from Ms. Damayanti.

"It never once crossed my mind that I would become the victim of an international crime, especially not in the United States of America. I used to admire American legal dramas like *NCIS*, *FBI*, *The Lincoln Lawyer*, and *Suits*. But now I feel as though I have been living inside one of those films, except in my story I'm the victim, trapped in the reality of American law, civil, criminal, and bankruptcy.

"My late husband was a district court judge, an honest, compassionate man who dedicated his life to justice and to helping the poor. He was known for being fair, humble, and kind. He gave the lowest possible sentences for minor offenses because he believed that justice should protect, not destroy,

the lives of ordinary people.  He was also a loving husband and a devoted father to our two daughters.

"After the Lion Air tragedy in 2018, my entire world collapsed.  The Boeing case and the stolen compensation money taken by the defendant and his associates have haunted me and my family for years.  My second daughter still does not know the full truth.  I live with the constant fear that one day she will discover it online because the trauma has left a digital mark that will never disappear.

"Time cannot heal everything, and money cannot buy back peace.  For seven long years, I have lived every day with pain and exhaustion.  The grief never truly ends.  It follows me into every night and every morning.  I suffer from thyroid issues, lumps, anxiety, and severe digestive problems, all caused by endless stress, by the feeling that justice has not yet been served.  My body carries the weight of a wound that no medicine can cure.

"My children have suffered deeply too.  My eldest daughter watched her father's coffin being buried without ever seeing his body, only a photograph.  She grew up sickly, quiet and withdrawn.  My youngest daughter was just nine months old when her father died.  She is now in second grade and often cries at school, asking why her father can't take her or pick her up like her friends' fathers do.  How can I answer her?

"Our tears can never be replaced by anything.  I've

asked myself countless times, Why me? Why us? But I finally understood. Perhaps it is because I understand the law, because if it had been someone else, they might have given up, stayed silent, and accepted injustice. But I could not. I must speak. I must stand up, not only for myself, but for all the other victims who no longer have the strength to speak.

"I still believe in goodness. I believe that good people will meet good karma and that justice, though slow, will always come. I have faith in the honorable judges in the United States who are handling my cases, civil, criminal, and bankruptcy, that they will act with wisdom and compassion.

"I have forgiven the defendant for what he has done. But forgiveness does not erase the crime. The pain and loss will always remain part of my life and my children's lives. Our case in America will forever be written in history. I only hope that this judgment will make the defendant realize the harm that he has caused and ensure that no other victims will ever have to endure what we have suffered.

"Let this case be a lesson for every attorney in America that victims deserve justice regardless of nationality, race, or religion. We are all born equal before the law. I believe that justice should not be biased and that it can bring fairness, peace, and safety in this world. Life and justice are priceless. No amount of money can replace them.

"I sincerely hope that the Court will make a fair and

wise decision, one that brings closure to our long and painful journey and marks the end of this suffering. Let this be the final chapter, the end of the story of victims like us who have waited for justice for far too many years."

Your Honor, I have one more victim impact statement to read, from Mr. Ramadhan.

"My name is Bias Ramadhan. I am the eldest child of Hasnawati, one of the victims of Lion Air Flight JT 610, whose family entrusted their case to the law firm Girardi Keese.

"When I chose this law firm, I believed it was the best based on my research and the dozens of lawyers who descended on Jakarta in the weeks following the tragedy. I made a profound mistake. This firm cared only about securing a settlement to benefit themselves, not to help victims find justice.

"The emotional and financial devastation we suffered is twofold.

"The crime of betrayal: After the crash, we were immediately confronted by solicitors -- George Hatcher, Azar Hatcher, Mohamed Eltaher -- who exploited our grief and ignorance of American law.

"They repeatedly reassured us that Girardi Keese was honest, competent, and staffed with -- quote/unquote -- 'champions of the Court,' mentioning Thomas Girardi, his wife, David Lira, and Mr. Keith. Every word was a lie.

"For months, we repeatedly demanded payment, only to be met with constant deception. Mr. David Lira, who was supposed to be our lawyer, failed to inform us that our settlement funds were gone. They used the excuse of COVID-19 to cover up and prolong the theft. They all acted in concert, willfully concealing the fact that our money had been stolen.

"They never cared about the victims. For them, every disaster was just a source of money. Upon learning my late mother was a high-ranking judge in Indonesia, they were overjoyed, seeing us merely as a pathway to a massive settlement they could steal for their own obscene profit.

"The loss of trust: Our loss is not just financial. It is a loss of faith in the legal system itself. My mother was killed by Boeing, and then her grieving family was betrayed by our own counsel. We were lied to repeatedly and ultimately victimized by the very system designed to protect us. I was forced to become an orphan and alone must raise and support my younger siblings.

"While we were fortunate to ultimately receive our full settlement thanks to Edelson PC's pursuit of justice, I am writing this for the hundreds of other clients who will likely never see their stolen money or receive any closure.

"Tom Girardi is an elderly man who enjoyed over 40 years of luxury funded by his clients' blood money. His sentence, however long, may not feel like justice when he is at

the end of his life.

"If there is any justice left in the American legal system, I ask this Court to deliver a sentence that can in some small way mitigate the pain and betrayal we have suffered. May this decision serve as a testament that there is still some justice to be found amidst our overwhelming despair and darkness."

THE COURT:  Thank you, Mr. Hasten.

MR. HASTEN:  Your Honor, Ms. Damayanti and Mr. Ramadhan went through the worst possible thing that I think anyone could.  They were represented by the defendant, and the defendant cared more about himself than he did for them. That's a fact.  The defendant lied to them.  The defendant knew that their settlement money was being taken by Tom Girardi. The defendant covered for Mr. Girardi.  And the defendant never did anything for them.

He left the firm, sure.  He called Mr. Girardi a thief on the way out, sure.  He's disputing that now, characterizing his statement that Mr. Girardi was a thief not as one that he knew but he suspected.  The reason that he did that was he was trying to distance himself from Mr. Girardi's fraud.

We're recommending a sentence here, your Honor, of 36 months' imprisonment, which is above the guidelines range, not by a lot, but by some, because the defendant knew more about what was going on at Girardi Keese.  And these poor

victims, Ms. Damayanti, Mr. Ramadhan, and the other victim clients, were caught in the middle of this.

Mr. Lira knew before the Boeing cases even were in existence at the firm, before the settlements happened, that the firm was in trouble. The firm couldn't pay its bills. The firm wasn't paying other clients. And then all of a sudden the Boeing settlement money comes in, and Girardi does it again. He doesn't pay them. He doesn't pay these clients. Girardi uses this money to fund the firm.

We're not saying that Mr. Lira personally profited from this, but -- although he did make a salary. He made over $250,000 for the five and a half months that he worked that year. Never once did he say, "Stop. Don't pay me. I know we're not paying clients. They're reaching out to me. These people just lost their spouses in Indonesia. They need this money." Not once.

He confronts Girardi on the way out and tries to portray himself as a hero. He wrote an article that same month touting his experience with Lion Air. He doesn't tell the Court. He doesn't tell his local counsel that Girardi has been lying to these clients. He doesn't tell the California legal community about what's going on there. He runs out of that firm as fast as he can.

And he didn't just stop monitoring what was going on. For some unknown reason, Mr. Lira still has access to his

Girardi Keese e-mail account. He forwards an e-mail to himself in late October, these victim clients still complaining, still saying, "We haven't gotten paid. What is going on? Why have you not paid us?" He forwards that to himself.

And this thing all blows up a month later. Judge Durkin calls everybody in and says, "What's going on here? Why haven't these people gotten paid?" And then he lies and says, "I don't know anything about those four people. I had nothing to do with that. I worked on four other cases that had been settled." Bald-faced lie.

Judge Durkin holds a hearing again. And to distance himself from Girardi, from all of this, he lies again. He doubles down. He continues to lie, and he's doing it because he's trying to protect his own professional reputation, your Honor. That is serious. He's admitted to criminal contempt of court, your Honor, but there's more. There's more, as your Honor can see from all the e-mail correspondence, the lies.

Judge Durkin found him not to be credible. That is a big deal when a judge finds somebody who testifies under oath not credible, and Judge Durkin didn't even have the evidence that we've uncovered. The defense says, "Well, he wasn't prepared. He didn't know about these e-mails."

I find that incredible, your Honor. I don't know how somebody with decades of legal training, legal experience, somehow forgets this and forgets the fact that his

father-in-law was lying to clients. And when he's asked by Judge Durkin why that happens, he just says, "I don't know." I think this was all a way for him to get out of that firm and to protect himself, and these poor people were left in the crosshairs, your Honor.

And thankfully Judge Durkin dug in and he figured this all out. And he figured out that the deception within this law firm, yes, Tom Girardi is the mastermind. He is the one that orchestrated all of this. But he could not do it alone. And there were people like David Lira, Keith Griffin that helped him do it.

Your Honor, I've read every single letter that Mr. Lira received. And, look. I'm not saying he's a bad person. I think he's done a tremendous amount of good over his career. And I don't know why this happened. I really don't. I think somebody like Mr. Lira, you would think that if they were placed in a situation like that, based on all the letters that I read on his behalf, would not have done something like this, that they portray a person that I don't see here, that I don't see as lying to clients, covering up for people, lying to judges. But he did that.

I think those letters are mitigating, your Honor. I can't say that they're not. But I also think they're aggravating because this was a person who knew better, who had a network to go to. He had a support network. He could have

blown the whistle on all of this, and he didn't. And I still don't know why. I really don't, your Honor, because this did not need to get to Judge Durkin in Chicago in December of 2020. This was going on at this law firm for a very long time, and it didn't need to get here, and it didn't need to end this way. It should have ended a lot sooner than that.

Your Honor, deterrence is really important here. Lawyers aren't supposed to lie. They're not supposed to lie to their clients. They're not supposed to lie to the Court. Lawyers aren't supposed to lie when their colleagues are stealing money from clients that they both jointly represent. This case represents the worst of what we see about -- in the legal profession, and it's something that is a stain on the profession. It's something that you just don't expect to happen. And when it does happen, it needs to be met with a strict punishment. People will pay attention to this.

The concept of general deterrence -- I say this in cases, your Honor, and I don't know always how much it matters. When I have PSN cases, a guy on the West Side of Chicago has a gun and I say, okay. General deterrence. I mean, sentence this person to whatever sentence because nobody in Chicago will ever pick up a gun again.

This is different. I think people in the legal community will say, wait. This is a crime. Not obeying court orders, knowing that somebody is stealing money and then I'm

not doing something. But, hey, maybe I'm not necessarily the worst guy here. That's a crime. You're lying to judges, you're lying to clients, and you know people are stealing settlement money. And when you get convicted of contempt of court based on that, that's serious business. That is a crime. That's a crime that could send you to prison. Sending the defendant to prison, your Honor, will send that message, will send the message that this is serious.

Specific deterrence as well, your Honor, I think matters here, that the defendant -- and, again, he has had a long and distinguished career, but he still wants to practice law. And I think that this message has been sent. I don't believe that he has not gotten the message, and I can't imagine what the past five years have been like for him personally.

But I think if he's still going to go be a lawyer, he needs to know that the buck stops with him. Not Girardi, not Keith Griffin, not the Edelson firm. There's a lot of finger-pointing from the defendant going on here. But he committed a crime. He knew that Girardi was a crook, was a thief. He let this all happen.

If the defendant wants to continue to go be a lawyer, I think a sentence of imprisonment will also send a message to him too that this is serious business, that however long you want to go about practicing law if you're still allowed to do that, that what you did here was not okay. This is not

acceptable.  You can't lie to your clients.  You can't lie to the Court.  You can't cover up for partners, associates, colleagues of yours who are stealing from clients.

It's just -- it's the worst thing that a lawyer can do, your Honor.  It's truly the worst thing.  You've got both of them here stealing from clients, lying to clients, lying to the Court.  Not saying the defendant stole from clients, but he facilitated it.  He knew it was happening.  He doubles down.  He lies to the clients.  He lies to the Court.

And, your Honor, I know as a prosecutor sometimes it's easy for me to just get up here and say throw somebody in prison.  Give them prison time.  And you're the one that ultimately has to make that decision, your Honor, and I understand that.  And I understand that's a weighty decision.  But I think this case matters.  It matters when lawyers act like this, when they behave badly.

When we have people from Indonesia saying that the United States court system is supposed to be that shining light on a hill, that's what we look to.  We don't think that this could happen in the United States of America.  We don't think lawyers are going to act that way.  And, unfortunately, they did here, your Honor.

And I think in a case like this, the message to be sent, that this will not be tolerated, that we are that shining light on a hill for the rest of the world, that our American

justice system does work, is to merit out a sentence of imprisonment that will carry a meaningful message to the defendant and to the rest of the world, to everybody who's watching this case, that this will not be tolerated.

Thank you, your Honor.

THE COURT: Thank you, Mr. Hasten.

MR. CHERONIS: May I proceed, your Honor? Thank you.

As you can tell from everybody involved in this case -- certainly I'm not excluded from this -- it raises a certain amount of emotion from Mr. Hasten, from the people who are on the video, and it's understandable from all sides.

On the one hand, we have a criminal act, no doubt, that we're not shying away from, that delayed money rightfully owed to clients who needed it. There is no doubt as lawyers, as judges, as officers of the court it hits home.

On the other hand, we have a lawyer, a person who has spent a lifetime, more than three decades, helping clients, serving his community, and doing the right thing. I don't think that can really be disputed. And the question, as it always comes down to in this building, is what is enough, what sends a message, what is justice for the Court, for those affected by this case, and for Mr. Lira.

And the real question as it comes down to, is justice only served if Mr. Lira goes to prison? And, your Honor, you have recommendations from probation, you have recommendations

from the government, and you have recommendations from us. But as Mr. Hasten told you, the buck stops with you. And we appreciate that.

And I have asked for a noncustodial sentence. And that's not something I do in every single case. In every case it's not appropriate; sometimes it's offensive. I don't think that fits the bill here.

But I want to start, because maybe it's the way I articulated my thoughts about this case. Maybe it's because, as your Honor pointed out, I can sometimes be aggressive, or maybe it's because of how I feel about my client in this situation.

But before I turn to the 3553(a) factors, both in words and tone, he gets it. He understands what he did. He is not here because a jury found him guilty and made him come here. He knows that his conduct can't be looked at in a vacuum. He committed a crime. The crime affected real people. And to say he is profoundly sorry would be the understatement of the century.

But by accepting responsibility at this point, he's trying to take those steps to make things right, to be the David Lira you read about in all those letters and not the David Lira that Mr. Hasten just described.

And the law requires you to look at certain things. And those things you have to look at are under 3553(a). None

of them is more important than the other. But we must consider the reality of the situation.

And I -- and at most sentencings I just sort of, you know, okay. The government's right, the government's right, and you ask for forgiveness. And I'm not trying to be strident. But this case is not simple. It is not easy.

So when I talk about other people, I don't talk about other people to pass the buck. I do it to draw comparison between who David Lira is and who he isn't. That doesn't mean he didn't commit a crime. That doesn't mean that crime was not serious. But the law actually encourages us to talk about other individuals.

You know, the government wrote something in their brief that hit me. It's clear Mr. Hasten and I don't see this case the same way, and he's a good advocate and I respect him. But he made the argument in his sentencing memorandum that Mr. Lira believes that this case is just of misfeasance as opposed to malfeasance, using those legal terms.

And part of what happened is misfeasance, obviously, if you don't obey a court order, you don't do enough. But as a lawyer, sometimes not acting is action in and of itself, right? That's just the truth.

And I didn't mean to minimize the offense by saying that. And while distilled to its elements he failed to obey an order, he also failed his clients in doing that. And knowing

David Lira, the person and the lawyer, that cuts him to the quick. That pierces him.

And I did not mean to downplay the seriousness, and I don't necessarily think I did because this order was not just so big insurance companies could get paid or people with a ton of money. I mean, these are people who needed the money, right? These were people an ocean away.

But within that, we also have to talk not just about the nature but the circumstances of the offense. And those two are usually discussed the same way, but I think they should be parsed here.

I mean, would I be doing my job? Would I be fair to Mr. Lira? Would it be fair to you if I didn't say he didn't make any money on this? No. That's something that we look at in this building when we're talking about sort of a dark heart or greed or those types of things. He didn't.

Was he contemptuous of the order? Absolutely. But there's no straight line that brings one of the most storied, respected plaintiffs' lawyers in California to a federal courtroom in Chicago. There's no straight line. And it's not as easy, respectfully, as Mr. Hasten made it out to be. And it's no disrespect to him, but it's not.

I mean, when we look at the circumstances of the offense, at the end of the day, I will not ever say that he did not want these clients paid for the right reasons. He did. He

64

absolutely did.

And if you look at the letters that were submitted by people who work at that firm -- right? You don't live 30 years in a practice and get people to just write those letters, right? You don't -- that doesn't happen. Your reputation is not built in a year or two years or five years or ten years. But the people at the firm said, yeah, David cared about his clients. He wanted them paid. He did these things regularly.

So what did he do? He confronted Tom. He screamed at him. He yelled at him. He pushed him. "Pay these people." Some of the government's exhibits were memos that David was sending to Girardi. "Pay these people." And it wasn't to extend a Ponzi scheme, which he has not been charged with in California or here. That wasn't what it was for.

And if you look at the government's portrayal, I think every fact, to some extent, you know, is weaponized. And you can also draw other inferences, that David Lira was frantic during this period of time, that he was scrambling to get people paid, that he did not want to lie to them. As he told George Hatcher in that text message, "I don't want to lie to these clients." He never thought anybody was going to see those text messages.

He had internal communications with the firm's CEO about how bad the firm was doing. But he wasn't told that the firm's CEO was stealing millions of dollars from the firm. He

didn't know that. He didn't know any of that.

You have Tom Girardi getting sued, acting like this mad king, David sending him memos that he's not paying attention to -- "Pay them. Pay them" -- engaging in confrontations. And then he leaves.

That is also a fair inference. And none of that means that he didn't do what he was -- that he did what he was supposed to do. I mean, you hit the nail on the head. He didn't tell your clients. He didn't tell the Court. And for that, the price that he has paid can almost not be quantified. And we will talk about that as we go on.

But when you look at specific letters that you've received -- and, you know, if you have to blame anybody about the amount of letters you got -- and I know you're not blaming anybody -- it's me. And the reason I did that is because he's not from Chicago. He's not a lawyer that you can say, "Oh, I know this person from this firm, and I know people." I wanted you to see what he is actually thought of by judges like yourself, by defense attorneys, by plaintiffs' lawyers, by his clients because that is not consistent with the aberrant conduct that occurred in this case. It's not.

I would be proud but for this season in his life to have a career where judges thought that way about me, or other lawyers. That's what I strive for. And he did that for his whole career.

66

Maria Carlos, who is a government witness. She was going to be called at trial. "He always demonstrated an extremely high level of professionalism in everything he did and was always fair, honest, and compassionate towards everyone he came in contact with, but especially towards his clients. He never asked me to do anything that would lead me to believe that he is anything but an ethical and decent attorney who worked hard to serve his clients."

He wasn't at the Jonathan Club or Morton's where Tom Girardi had his name on a booth drinking. No, he came in. He pumped gas, at work, and he went home to his family. That's what he did. You heard that from Amy Solomon.

Shawna Mills, who was his paralegal, who I was going to call to testify at trial, said, "I worked for David during the time frame of the various accusations against him. I know that he wanted every client to get paid as soon as their case settled. We discussed every settlement since I was the one responsible for drafting the disbursement statements, negotiating liens, and obtaining case costs from our accounting department. If David saw anything that looked questionable, he was going to ask about it."

And then Amy Solomon tells -- you know, just talks about the firm and how there were these hangers-on and these glad-handers with Girardi, and it wasn't David. And, you know, we've had so many conversations. You know, he would take

depositions in the firm conference room, and he had to turn his back to the oil painting. And we all know people like that. We all know people like that who put themselves above their clients.

And he's right. Girardi & Keese did survive because of David Lira, but not because he was a thief, because he was a good lawyer who actually tried cases. And I never thought I'd stick up for that firm, but the truth of the matter is that firm for the majority of its career did exceptional work, took on the biggest corporations, the little guy they represented until Tom Girardi lost his mind and decided that *The Real Housewives of Beverly Hills* and the three planes are what is important to me.

David Lira doesn't have any planes, doesn't have a mansion. He's not a wealthy man. He worked because he loved his job. And when I talk about, you know, he could have made millions elsewhere, that wasn't to throw it in anybody's face. But that's the truth. I've talked to lawyers in California who've said with his skill level, he could have gone out on his own ten years prior to that and he could be retired by now. But he -- part of him just liked the day-to-day, the people he worked with, working on good cases. It wasn't all bad. We cannot put his entire life into this bucket.

And lawyers, right? Mr. Hasten talks about the shiny hill, and he talks about lawyers and the American judicial

system.  And despite what may be happening in this country, it is the best in the world, and hopefully it always will be.

But what is lost when you're making these arguments as a prosecutor is that we're human beings.  Lawyers are human beings.  They experience emotions, frailties, struggles as everyone else.  We don't graduate from law school and get bronzed with infallibility.  20 years into our career, we don't get anointed that you won't make a mistake.

And, understandably, the government is right to say he knew better.  He was better.  He should have done better.  There's no doubt.  And I don't quarrel with that because with great power comes great responsibility.  And it's a privilege to do what you do.

But at a sentencing hearing, Judge, the allow -- the law allows you to consider those frailties, those foibles, those -- it allows you to consider fallibility itself.  And the government to its credit did some of that.  They did.  And I applaud them for that.  But the circumstances here were messy.  And the suggestion that he should have gone to the judge right away is a noble one.

And, you know, there's been a lot said about the Edelson firm.  And the only thing I will say is this.  And this is not even a bad thing to say.  This sort of bizarre situation, they did not contact the Court for five or six months after they learned Girardi & Keese had the money and

hadn't paid the clients, right? Should they have been hauled into court and charged? No, right? Because this was a ridiculous situation, and they're not the same because they don't have the background with Tom. I get that.

But it shows you that this was insane. I mean, just think of it, Judge. I mean, I get $10,000 from a client. I put it in my trust account. I'm, like, freaking out. Like, I just want to document it. Here it is. Let's make sure. I get it. This firm had billions of dollars going through its trust account. And I'm not sure if you know this, but it was run like a mess, right? Chris Kamon, who wasn't even a CEO -- or an accountant, ran the accounting there. It was a disaster.

But it was a very messy situation. And I think what I try to stress with him before I move on to other factors is some people you can look at and say, man, this guy woke up one morning and said I'm going to be a criminal. Woke up one morning and said I'm going to steal from somebody, woke up one morning and said all these things. And I don't think David Lira did that. I think that this was a crime that is so sad for the victims, so sad for him, that has ruined an otherwise wonderful career.

But he did not steal. He did not. And when you're sentencing a man and when you're looking at what he did and didn't do, you have to take that into account.

And as I think you can probably tell, this case would

have been a hard-fought trial, your Honor, and I'm glad we're finishing it this way because I think it's fairer for all involved.

And, you know, I know your Honor has said -- and I'm not -- I'm not quarreling with you. I know what you said about you thinking Mr. Lira lied, or "was not candid" was the word you used. And what I tried to do, and maybe it wasn't artful, was to just show you an example of a situation where there's information that we think somebody has and they testify inconsistently under oath.

Ari Scharg had an e-mail where he was told that one of the cases had been funded, right? He testified under Judge Durkin that he didn't know about it until four months after he received that e-mail, right? Is he lying? Well, if he was on the witness stand in this trial, you would have seen a pretty good cross of him, right? And what would have happened, Judge?

THE COURT: I understood that I was seeing some of your cross --

MR. CHERONIS: Well --

THE COURT: -- in the filing. I mean, I get it. You knew -- really knew the file.

MR. CHERONIS: And -- thank you.

And what would Mr. Hasten have said in his closing argument? "Mr. Cheronis crossed Ari Scharg. Ari Scharg made a mistake. He wasn't lying under oath. He made a mistake."

And I think it's really unfair because when you think of perjury, you've got to get in somebody's head, right? You have to really know that they were lying, that they were not confused, that they didn't misremember, that they weren't nervous. That's a hard thing to get to.

And I would have called character witnesses that you read about, who would have talked about what an honest man he is. He didn't plead the Fifth at that hearing like Kamon and Girardi did. He didn't run. He knew that the U.S. Attorney's Office was involved.

And this whole thing about him lying initially about when the things were funded, I don't even understand that because there was no doubt that at least by June, he had told Edelson about it. That wasn't a lie. It just wasn't. I mean, there was really no issue at that point that at least by June, the Edelson firm knew about it.

When it actually funded or not was not something he was sitting back trying to dissemble about. So maybe we're in disagreement about that. Maybe the government is. But I know this. I know that David Lira is the man who testified as best as he could at the time, and he would not intentionally lie to Judge Durkin. That's our position regarding that. And it may not be something everybody agrees with.

And you can't talk about the nature and the circumstances of the offense without the Lion Air clients being

mentioned. And some of their names were read today, and out of respect for their privacy, I'm not going to mention their names again. But their voices have been heard in this case, Judge.

The loss that they suffered in those letters is not just a loss compounded by David Lira. It's a loss -- first, a horrible loss that they suffered that we -- it's everybody's nightmare. And then the stealing of the money from Tom Girardi. And, yes, the not being candid with them about what happened by David Lira.

But it seems like a lot of that is just focused on him as the lightning rod, which is understandable. I get that. They have that right, absolutely, to feel betrayed in that -- in that respect. But we should not sentence out of anger, and we should not get to the point where the only way that they get justice is if Mr. Lira goes to jail.

He understands the depth of his failure, and he's going to speak to that.

THE COURT: One clarification.

MR. CHERONIS: Yes.

THE COURT: I know they were ultimately paid.

MR. CHERONIS: Yes.

THE COURT: What I don't know is how long of a delay. Was it a year? Was it three years?

MR. CHERONIS: I think it was over a year, Judge. It was --

THE COURT: Okay.

MR. CHERONIS: I mean, I think the way I look at it, and I don't know a hundred percent, but in December of '20, Judge Durkin suggested the Edelson firm pay this, and then sometime after that it was paid. So it was over a year. I don't have the exact date.

MR. HASTEN: It was close to two years, your Honor.

MR. CHERONIS: Close to two years. Okay.

THE COURT: Okay. Thank you.

MR. CHERONIS: You asked at the beginning of this before we even started arguing about the guidelines what potential collateral consequences Mr. Lira will face.

And he has been suspended by the state bar of California. The suspension started October 3rd of this year. They are moving to disbar him. And, your Honor, he still has to deal with that, but I would be a liar if I didn't tell you that the probability of that happening is extremely high. Extremely high. And I don't think the government would disagree with me on that part.

And when you think of that, I mean, Keith Griffin got an 18-month suspension before even being indicted in this case. He was suspended for 18 months. And Mr. Lira now has a conviction in federal court. We know; you know; we all know. And that is the death penalty for a lawyer. And not just any lawyer, the lawyer who lives it.

I mean, when people ask me why I'm a lawyer, I say because I can't sing and dance, right? It's a joke, but I mean it. It's his essence. And when you talk about him as a lawyer and those letters that were written -- I mean, he's not a lawyer who just goes to work and doesn't talk to other people and help other people. I mean, he is looked at as, you know, one of the best.

And as you know, when you were a lawyer, a big part of who you were, I'm assuming, was a lawyer. Just like as a judge right now, a big part of who you are is Judge Mary Rowland. A big part of who I am is being a lawyer.

And the loss of that is not something that is contemplated by the guidelines. It is extremely significant. And he is not a wealthy man. He is not -- he's not poor, but he's not rich. He didn't make hundreds of millions of dollars. He didn't. You know, his salary was nothing to sneeze at by any means, but, you know, there are plaintiffs' lawyers who have been out for five years who make three or four times that amount of money. And he is the only breadwinner in his family. He's got children in college that he has supported.

But that's not where the collateral consequences end. That's not it. If that were it, that might be enough, but that's not even it.

You know, at some sentencings, no matter the case, a client will say to me, "At least it's over," right? Whatever

it is. "At least it's over. I can go on. I can breathe sort of fresh air at this point."

But he has no such respite. He has a case pending in this building in front of Judge Kennelly. The Edelson firm is suing him for their attorneys' fees in this case. He is a named defendant in a civil RICO case in the Central District of California where the Edelson firm is seeking $50 million there. And I think we can all agree they're not going anywhere, right? They're not going anywhere.

So he has -- you know, the new movie that came out, *One Battle After Another*, that's what he has to look forward to. There is no breath of fresh air for him.

And other collateral consequences. The professional toll, the headlines, the professional shame, the media mockery, the music videos that have been made about David Lira like he's some kind of clown. And having represented criminal defendants yourself, Judge, the sleepless nights, the loss of health, the emotional strain. He has lost much, including his reputation and everything else.

So to the extent that people are listening, that's not punishment, significant punishment? I would disagree.

When we talk about justice for him, it must reflect not only the gravity of the victims' loss but the difference between those who stole and those who didn't. And that is a tension between law, mercy, punishment.

I'm going to close with a few more comments or a few more sections about his history and characteristics. I've told you about that.

Judge Kendall said something once at a sentencing that stuck with me. She said being in a federal sentencing in a way is like being a guest at your own funeral. And she didn't say it as a joke or as a negative. She was trying to explain to a client the gift that he received by hearing what the world thinks of you, good or bad. But in that instance, she was talking about all the letters that were sent.

And, of course, I love Judge Kendall, but it's a gift nobody would ever want to receive, but a gift nonetheless. And what you have seen from the support, you know, the government said people are watching and listening. He's right. I don't know what people he's talking about, but a lot of people are talking and listening.

And you've heard from over 200 of them who stand behind Mr. Lira. He's been admired by those he's worked beside, respected by those who opposed him, and loved by those he has mentored and helped. You've heard from everybody. You've heard from judges. Judges. I mean, do you think a judge in California is just going to say, "Oh, I'm going to write this letter for David Lira, who is a convicted felon now, because it's a good thing to do"? Or are they writing that because they know him, he has appeared in front of them, and he

has earned their respect?

In this single painful chapter in his life, he lost his way for sure, but not his conscience. And he's got so much good that he's done that should be counterbalanced against that.

As we're, you know, summarizing this, you know, deterrence is always an issue. I don't think specific deterrence is an issue at all. I absolutely don't. I think for one of the reasons I mentioned, the California state bar is moving on this with haste. But also he has an entire lifetime in the past working and five years since he's been charged where nothing's gone wrong, where no clients have, you know, lost their money.

But general deterrence is something that we do need to discuss. It's often cited as the rationale for incarceration. But there is no rule, none, that says general deterrence can only be achieved through imprisonment. If ever there were a case proving that, I would suggest it is this.

This case has been covered internationally. It has inspired documentaries. It has inspired podcasts, music videos. It has prompted reforms in the California state bar. David Lira's name is now synonymous with the consequences of a lawyer's ethical lapse. What a legacy.

He's suspended, and that's coming. It's going to be worse. So let's put a finer point on it, Judge, if people are

watching. Is there a lawyer anywhere in the world, much less United States, who would sit back and say, "Well, Lira was indicted, shamed publicly, professionally destroyed, financially ruined, likely disbarred, but he didn't go to prison, so I'm going to disobey a judge's order." Deterrence has been served in this case, period, and it doesn't take a prison sentence to send that message.

And when we talk about this shining light on the hill, it also involves the fact that mercy is a concept in the American legal system. It's not just locking people up. It's not locking people up who have done nothing else in their life in 65 years, a 65-year-old man who's never ran afoul of the law other than the first three months of the spring of 2020, ever. That's not the message that we need to send as the American legal system.

We pointed this out in our memo. And, you know, it's striking. You know, at Chris Kamon's sentencing, there were no letters read. There were no arguments made like that, even though he's the one who actually helped facilitate the stealing of the money. We didn't hear that there. And that's fine.

He didn't get an extra day in prison because of this case. He did not. It's the truth. Let's just speak it. It's what's happened. And I'm not saying he deserved it. Ten years is a long time in jail. Good for you, Judge, that you didn't give him any more time. He's learned his lesson.

But it's still the fact that he's not getting any time for this. Tom Girardi was dismissed from this case. Good for him. He is somebody who has lost his wits and doesn't deserve to be hit with the hammer of another conviction.

But David Lira now is wearing the jacket for these guys here, the only guy who didn't steal the money. And, again, I find myself straying into, like, defending him when all of this is surrounded by the fact that he brought himself here, right? That David brought himself here. He wasn't dragged. He made those mistakes.

Justice in this case is not one-dimensional. It is not blind to grace or your mercy, Judge. He has accepted responsibility. He has already paid a tremendous price. And anybody who says he has not is wrong.

We are asking that you don't take him away from his family, from society. He's suffered enough. And we think your Honor has the ability to do justice to the victims of Lion Air, to do justice to this Court, and to do justice to David Lira by sending a message that doesn't mean he has to go to jail.

If it's home confinement. If it's community service with something saying he's got to speak to bar associations in California, to talk about how this affected him, those are things that can teach, not to lock up a man who is good at heart, who never tried to steal any money and made horrible decisions in the worst season of his life.

So that is what we were asking for. Thank you.

THE COURT: Thank you.

Do you want to add anything before allocution?

MR. HASTEN: Your Honor, I just want to again respectfully highlight this was not just a few months' momentary lapse of judgment. I want to focus on the misstatements to Judge Durkin as well. I think that is extremely important to consider in this case.

December 2020, Mr. Lira denies knowing that these clients have been funded. A year later, he denies knowing that Tom Girardi was stealing money -- or had lied to other clients or had not paid other clients. It's not just this window of not paying clients. It's the lies to the Court as well which I think are so serious here, your Honor, and I ask that you consider that, and I know you will.

THE COURT: Okay.

All right. So, of course, Mr. Lira, before I impose sentence, you have a right to say something. You're not required to, but you're free to. I just need you near a microphone.

THE DEFENDANT: Thank you, Judge Rowland.

THE COURT: Yeah, good morning.

THE DEFENDANT: I truly appreciate this opportunity to address the families and the Court.

I am completely overwhelmed with a range of emotions

in this moment of time. I've stood in front of judges and juries hundreds of times, and I was never lost for words. I'm, quite frankly, afraid that I won't do an adequate job. This is not a closing argument for me but an act of contrition.

Please know that I stand before you as a broken man, drenched in shame. I stand before this Court to account for my errors, which I haven't denied. For the last five years, regret, remorse, anxiety, and suffocating sadness have been my daily companions.

I stand before this Court hoping that I could go back in time and do things differently, but I cannot. All I can do is apologize to the victims, the Court, and pray that I can be with my family and survive the consequences that will follow.

I have become distant from friends and family because of the shame. I can hardly get out of bed at times. In the simplest terms, I'm living a personal hell. And it's not about me. It's about my family and my children that you've heard from.

First and foremost, I want to apologize to the families for not alerting the Court. I did not intend to aggravate their loss, their horrible loss. I did not act out of greed. Not one penny came my way, nor would I ever accept any compensation that I was not due.

And my acts were not a result of some weird loyalty towards Tom Girardi. In fact, we had been estranged for over a

year and a half before these events unfolded. I had planned to leave the firm six months before this all imploded. And the reason I didn't leave sooner only had to do with my trial commitments at Girardi & Keese.

I was in trial the whole month of February of 2020 in a toxic tort case that had been pending 20 years. Yeah, I could have walked. But I didn't want to leave those clients who knew me. And I battled for them for 20 years, a case that changed the law in New Mexico regarding expert testimony.

So I felt loyalty to the clients that I had that remained at Girardi & Keese. I was settling cases up to the day I left the firm on June 13th.

I -- and I'm relying on some notes, your Honor, just because of the emotions involved here.

I want the victims, I want the Court to know that I wake up every morning, I go to sleep at night with this scandal and those victimized by these events. As I said, I wish I could go back in time.

There was a lot going on. I'm not making an excuse. Anything I say to the Court, I don't want it to be a "woe me." It's just the circumstances I found myself. Extreme disappointment, anxiousness.

I did what little I could. I intercepted Tom's letters. I told the staff, "Don't send any letters from Tom Girardi." I enlisted the help of other lawyers to get Tom to

pay the money. I wasn't complicit with him. I wanted the families paid. And them not being paid is one of the worst acts of attorneys, but I didn't orchestrate it or engineer it.

Now, please, I want the client -- I want the clients to know that my actions were not a product of greed or indifference. I want them to know that I did not profit from my errors, and, in fact, I have lost everything.

I want to -- the Court to know that I believed in my heart that Girardi would eventually pay the victims. And why do I say that? Only because literally billions of dollars went through that law firm.

The accounting records were secreted away. I did not know Mr. Kamon's embezzlement scheme at the firm that was hot during this time. I heard the lawyers in Los Angeles testified that his embezzlement is in the tune of 50 to 70 million. I didn't know that, and I'm not making an excuse for the nonpayment.

I didn't know that Tom and Mr. Kamon spoke every day and spoke about balances. As my lawyer submitted by affidavit from a person inside the accounting department, I was kept away from all that financial information. Now, would that make it different in terms of my legal obligations to the clients? It does not.

I'm just trying to give some context to those months leading to my resignation. There was a lot going on. There

was panic from Mr. Griffin.

My first order of business when I resigned from Girardi & Keese was to have a telephone conference with the Edelson lawyers, which I did. And I gave them an update. All the cases had been funded, even the cases that are referred to me by Mr. Koushan, who were timely paid. But the Lion Air victims that had been referred to Mr. Girardi had not been fully paid.

So I believed in my heart that Girardi would eventually pay. Unfortunately, the word "eventually" did not make its way in Judge Durkin's order. I know that.

But I stand before you, your Honor, that I knew enough, and that is why I stand before you today. Despite what I knew or didn't know, I was wrong and I failed the families in the process.

I want the families to know that I confronted Girardi several times before I resigned. Some of these confrontations were witnessed by employees within the firm. I was described as yelling at Mr. Girardi. I cajoled him. And with each passing conversation and confrontation, it escalated.

Yeah, I have sinned. I've sinned by keeping it in-house and trying to solve this problem on my own. But I failed. It wasn't because I wanted to be disrespectful to Judge Durkin. No, I would never do that. I was just trying in my own inadequate way to get the victims paid before I left.

The government has described me as fleeing a bad situation. It is a -- was a horrible situation. I continued to represent a family from the Lion Air disaster for months after I resigned from Girardi & Keese. I did it pro bono because I cared about them.

I want the -- I want the families to know that I failed in my efforts to persuade Tom to pay. I didn't take that last step, which was to notify the Court. And I never denied that.

During the OSC hearing in front of Judge Durkin, I was asked that question. "Why didn't you call the Court?" And I answered, "I took a different path, a path that I felt at the time would do the least amount of destruction."

And I mentioned the other 100 employees that worked at Girardi & Keese at the time. I wasn't prioritizing them over the victims of this horrible plane crash. I was not. It was just all these thoughts were going through my mind. And I am mindful of the lawyer's duty of loyalty to clients. That's been in my heart for 37 years.

Your Honor, I want to apologize to Judge Durkin. It's interesting when I was trying to find local counsel, the Edelson firm was involved in the Girardi -- the case that was referred directly to Mr. Girardi. I reached out to Judge Durkin's brother, Kevin Durkin, to see if he would serve as my local counsel instead of Edelson, but he said, "Hey, Lira. My

brother's on the case. I can't do it." And I said, "Okay." And that's why I struck a different deal with the Edelson firm when it came to the referral, because I had to pay the referring lawyer, Mr. Koushan.

So I want to say -- and I wish Judge Durkin was here -- that despite my obvious failings, I never intended any disrespect to him or the Court. Truth be told, your Honor, the courtroom is like a second home to me. I've had the privilege of trying cases throughout the states, all up and down California, and I find more comfort in a courtroom than in the office filling out discovery requests and the mundane duties that go with a lawyer.

And I say this, your Honor, that in 37 years as a lawyer, I have never been sanctioned by a Court, even in other states, for any misdeeds, nor has the state bar disciplined me in any degree until the Lion Air.

I want my legacy to my children to be in part that I conducted myself to the best of my abilities. I'm not going to talk about the letters because I couldn't work my way through them. Reading letters is like reading your own obituary. A good friend of mine who spearheaded this effort, he said, "Don't you want people to" -- "Don't you want to know what people think of you while you're alive instead of when you're six feet under?" I took that advice, but I couldn't do it. I couldn't read my children's letters. I just can't do it.

I had to convince my children not to be here today to bear witness to the lowest point in my life.

I will say this. The only grace that has sustained me this far is my wife Jacqueline (indicating), immediate family and friends who have not given up on me, even though I've given up on myself.

In closing, your Honor, I want to say a couple things. I know your Honor has been flooded with briefs, arguments, evidence, and letters. One judge thought I was an expert in hearsay. When I saw -- hear the government's position, I go, "Isn't that hearsay? Where's the proof? It's innuendo." And I know you have a lot to deal with.

I just wish you could look into my soul and heart. I am flawed. I would never deny that. But I did not intend harm to these people or disrespect to the Court. I took the wrong path.

I thought I had the powers of persuasion over Mr. Girardi. Our last conversation ever between Mr. Girardi and I was in his office on June 13, 2020. It was a conversation that went into a shouting match. But I always say you get more with honey than vinegar. And so I begged him. I pleaded with him. I told him the 55-year-plus work that he's done in changing the law in California, in the United States, is all going to be torn down by his actions and not paying these victims.

Cajoling, the use of honey, I felt I wasn't getting there. So it escalated. I told him to do it for his grandchildren. I told him to call me on Monday morning when I started my new firm. I said, "Call me, Tom, and I will come back to Girardi & Keese. But just show that you made the payment." To that day, I believed he was good for it.

Mr. Girardi had wealth beyond my imagination. It's kind of playing out because the bankruptcy is still proceeding in the Central District and will probably play out another five years given the massive wealth he has.

So I didn't think that was a stretch, saying, "Call one of your friends. Get the 2 million," because that's what was due to the clients. He had sent them half. "I know some of those people. I will call with you."

But then he became very defiant, telling me that this is his firm and not yours, started screaming at me. And those were the last words spoken between Mr. Girardi and myself.

I've listened to the government describe me as a non-caring lawyer, but nothing is further from the truth.

Your Honor, in preparing for today, so many thoughts raced through my mind. I'll be the first to admit I've lost trials. That goes with the territory. But I've never been a loss for words in front of a jury. Even in losing efforts, some of the jurors would later retain me as their lawyers because of my spirit.

In preparing for today -- and my poor wife had to put up with me while we were locked away in the hotel here in Chicago since Friday -- deep conversations about imprisonment, what do we do for our family. The hardest discussion I've ever had in my life, other than the day when I had to call my children and tell them that I was pleading guilty to contempt. Okay.

So I've had some time since June 5 to reflect on my life and my role as a lawyer and what a privilege it has been. If I sound defeatist, I am. This case -- and I'm not disregarding the contempt conviction. This case is so high-profile that I will be disbarred. I've got to come to grips with that.

But it was never about the money for me. I didn't come for money. I love the fight and appearing before a jury and a judge.

One case came to mind where I represented two young girls who lost both parents. They were 13 and 10. So they lost both parents, grandfather, and a sister in one instance. I remember attending a four-casket funeral. And I was overwhelmed by the community of that -- of that neighborhood.

I remember going to the County Clerk's Office to obtain the death certificates. The clerk was an elderly Hispanic woman, and she asked me why I was picking up death certificates. And I told her why. She took my hand and

stated, "You are doing God's work."

I've never forgotten those words. Having handled well over 100 death cases in my career, it was never about the notoriety, about the potential of the big payday. It was rather the clients.

I found extreme joy and pleasure when I would walk into the courtroom alone taking on Shell Oil, Texaco, Ford. The more lawyers that showed in opposition I rejoiced in.

I was known, and I think it's reflected, from what Mr. Cheronis told me, a couple letters, where I was known at the firm Girardi & Keese as a lawyer who cuts fees if it made the clients' lives easier.

So everything the government has tried to convince you of is not who I am.

Deterrence. You know, I -- you know, when you have time on your hands, you go to all these places. I don't know much about the sentencing guidelines. I was given a tutorial, and I still don't understand it, quite frankly. And I know its purpose, so that there won't be disparity between different crimes. And I understand that basic premise.

But what it all boils down to now, your Honor, is I look forward. I am now but a cautionary tale. And I will go to my grave a convicted felon. It is my hope that other lawyers will learn from my mistakes in judgment. For lawyers thinking of crossing the line, remember that the court order is

sacrosanct as is the obligations to the client.

Know that an indictment alone -- and as your Honor is aware, I was indicted for multiple counts of wire fraud, perjury, and the contempt. The indictment alone is the death penalty of your reputation, livelihood, and soul. So if there are people listening who are lawyers, I am the poster boy for those who are thinking about crossing a line and violating a court order.

If there's anything I could convince you of today, your Honor, it's I don't have a dark heart. I'm not greedy. I love being a lawyer. I'm not saying I'm good at it. It's just I would be handed a file on Friday for a trial starting on Monday, and I took my lumps. I just love the idea of pursuing justice.

In the end, your Honor, my errors, my failures will haunt me until my last breath on this earth.

I want to close by saying I truly wish the families health, peace, now and always.

Thank you, your Honor.

THE COURT: Thank you, Mr. Lira.

Anything else from the defendant?

MR. CHERONIS: No, your Honor.

THE COURT: Okay. We're going to take a 10-minute break, 15-minute break. Okay?

All rise.

(Recess at 1:13 p.m., until 1:25 p.m.)

THE CLERK:  All rise.

THE COURT:  Thanks for that break.

THE CLERK:  You may be seated.

THE COURT:  Did you need me, Jasmin?

THE CLERK:  No.

THE COURT:  Okay.  Anything else from anybody?

MR. HASTEN:  No, your Honor.

MR. CHERONIS:  No, your Honor.  Thank you.

THE COURT:  Okay.  All right.  Thanks for letting me take a break.

Okay.  So, Mr. Lira, the law -- it's called 3553(a), but it requires that the Court take into account the nature and circumstances of the crime and then the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide for a just punishment.

Do you want to -- where would you like to be?  Would you like to be at the podium, or did you want to sit, or do you want to stand over there?

THE DEFENDANT:  I stand out of respect, your Honor.

THE COURT:  Okay.  You want to stand with your client?

MR. CHERONIS:  Absolutely, Judge.

THE COURT:  It's to afford deterrence.  We've heard some about deterrence today.  It's to protect the public from future crimes by the defendant and then to provide you with any

educational training, vocational training, medical care. I'm not particularly concerned about any of that in this case.

I'm supposed to take into account, of course, the sentencing guideline range, and then I'm supposed to try to find a sentence that limits disparities.

What are you doing? Are you just standing here?

MR. HASTEN: I thought if everybody else is going to stand, your Honor, I would too.

THE COURT: Okay. All right. I didn't know if you had something to say.

Okay. In the end I'm supposed to find a sentence that's sufficient, but not greater than necessary, to achieve all those goals.

Okay. Mr. Lira, I think you can understand that this is a complicated case. And there's a lot of facts. I think I have a handle on all of them. I've studied them. I appreciate the lawyers for presenting them to me in a coherent fashion.

And it's complicated because I think it was your lawyer who started who said it really hits home, and it does. And I think you know why.

But, you know, we all love being in the well of the courtroom. We're all junkies, kind of, in terms of practicing law and wanting to be in front of juries and really believing that our system is the best. Even though we are currently in difficult times, we still believe we have the best system. And

we really hold true and value the rule of law.

And I think I'll just speak for myself being on the bench. I feel it's very vulnerable right now, and I feel very concerned about it. That's aside. But an offense like this really hits at that and makes us feel vulnerable and concerned.

And I think it was probably Mr. Hasten who said all the letters, they're mitigating and aggravating because you are a lawyer that we expect to know better.

So we all know some lawyers who kind of fly too close to the sun maybe too often, and we distance ourselves from those lawyers. And when we -- when I see a case on my docket with those lawyers, I know that lawyer's in a case, and I'm cautious.

And then I see lots of other lawyers who are in my cases, like the lawyers before me this morning, and I think, ah, I'm in good hands. I know the rules will be followed, and I know that I'm going to be taking -- you know, I can trust what's happening in the case. And I just do my job, and they'll do their jobs. And I hope that I was that kind of lawyer.

And so to hear all these wonderful things said about you -- and I know you also fought for the little guy, if you will, and you were on the plaintiffs' side. And, of course, defense attorneys in personal injury cases, they're also doing their job. But you were kind of David and Goliath, the David

in those cases and trying to represent people who didn't have access or maybe weren't as sophisticated as the people on the other side of the v. And so, you know, we expect more from you.

And so that makes the case -- I don't know -- more complicated, more difficult, more painful.

Obviously, your lawyer's done a good job at explaining to the Court the collateral consequences. I wasn't aware of all those. I'm not surprised by them, but I'm -- I'm sorry for you that you're suspended on the California bar. I know the first sentencing memo I got, I think your lawyer had explained to me that you were reemployed and you had trials set and you had a stable of clients coming in. I suspect you've farmed those cases out, and I'm sorry that won't be available to you, obviously, for your civil litigation that's pending and just supporting your family and your retirement and whatnot.

So I understand that you've paid some prices here, and I'm taking that into account. I understand there are also more permanent disbarment proceedings pending, and I think it's reasonable for me to take that into account.

And you're also facing some civil litigation.

I don't know what's happening with the bankruptcy. I don't imagine that has anything to do with you, but you're facing civil litigation by the Edelson firm.

THE DEFENDANT: And, your Honor, and by the bankruptcy

trustee clawbacks.

THE COURT: I see. I see. Okay.

I can't help but -- if I could just have a side note, because I did watch the Edelson YouTube video. And I want to say I appreciate that the Edelson firm arranged with its insurance company to cover the payment to the victims. I think we all appreciate that. And I -- it still took them two years to get paid, so I appreciate that they were paid.

It may not be for me to say -- and I probably have seen less than five YouTube videos in my entire life. I'm not a big YouTuber or social media person -- but I found that video in incredibly poor taste. What happened here is extremely serious, and it involves the Court. And pretending to be a basketball team and pretending that there are mobsters and -- I don't know if that's a way to profit or if that's an advertisement. But it made me feel like people were denigrating -- further denigrating the Court and the court system. And I -- probably not worth much, my opinion, but I just found that sort of more troubling in this whole troubling scenario. So I offer that as my opinion.

Now, Mr. Lira -- and I'm sorry that you've also been through -- I understand you have other collateral consequences which involve -- I don't know -- ruining your reputation aside from not being able to practice.

I really have no doubt that you were a good lawyer,

and I'm sure you cut your fees. I did plaintiffs' work as well, and cutting fees was -- I think I cut more fees than I made, actually, which is why I applied to come to the bench. I didn't know about government shutdowns, so I thought there would be regular pay.

I do want to say, though, I read the transcript. I already said that. And I think there were places where you were not candid with Judge Durkin. And I think that was -- I mean, maybe it was an understandable instinct. But it was only in -- we were in 2020, right? So it was only in 2019 that there were lots of -- you had lots of e-mails trying to get people paid, to your credit. But -- gosh, I'm sorry. I took so many notes.

So there was one young man. I think his name was -- oh, I put it all in here. Maybe a Daniel Davis. And he's writing about an Oppenheim settlement. And there's somebody who is very angry who is writing about that. And there's a -- you actually write -- in early January 2020, you send a list of clients who need to be paid and you say, "You know, look. They're calling, and they're making threats. We need to get them paid."

There's this Cesar Castillo who's got a late payment. This poor guy Oliver Barry, he was a client. His grandfather got involved in trying to get him paid. There's a Mr. Spett. Apparently he didn't get paid.

So I'm not in the weeds on this stuff the way that I know your lawyers were and the way that I know the government probably was in preparing for trial. All I'm observing is when you go to Judge Durkin and he says to you, you know, "Do you ever know in the past that people were" -- you know, "there were problems getting clients paid in the past?" it's just not true for you to say, "No, I've never had that experience."

So I see your lawyer raising his hand. But I'm just trying to get here kind of the level of culpability because it's a complex case. And I believe that when you were at Girardi & Keese, you're going to work every day, you're trying to do the right thing, and you're frustrated with Tom Girardi.

And he sounds like he's trouble in lots of ways. I mean, he's a narcissist. He's a megalomaniac. He's quit working. He's going out for three-martini lunches. Like, he's got lots of problems. He's spending more than he's bringing in. You know, lots of problems. And so you're trying to get people paid. But I'm not really focused on that -- okay? -- or I would have hit you with the amount of loss.

I'm focused on how are you interacting with Judge Durkin? How are you conducting yourself as an officer of the court? You're walking into a federal courtroom not unlike this one, two-story, two floors up. And he's got you under oath, and he's asking you questions. And so I'm trying to figure out how serious that is.

And I understand you don't have all your e-mails in front of you. And your lawyer's doing a great job. And had we tried the case, he would have done a great job telling the jury, "Hey, he didn't have all his e-mails in front of him. And he wasn't like the AUSA, who is prepared and, you know, has gone through all of this with a fine-tooth comb." I get all those arguments.

But to sit in front of Judge Durkin and say, "Well, gee, I don't think anybody else had had that problem," I just -- I find that incredible. I just find it hard to believe because those are big fights to be having with Tom Girardi. You're worried about Daniel Davis with the Oppenheim. You're worried -- you know, these are four clients right here that in 2019 -- yeah, 2020 -- 2019 you're raising problems with the head of the firm, saying, "We've got a real problem here," and the AMEX is shut down and, you know, other problems.

And I'm struggling with the fact that at that time you didn't say to Judge Durkin, you know, "There were other problems." And you might not have had all the details, and you wouldn't have known the day you sent an e-mail, and you wouldn't have known that, you know, you wrote -- I mean, you left -- you wrote him a list where you wrote out, "These are the people that are owed. Get them paid. They're threatening to call lawyers. What the heck are we doing?" Good for you. You should be doing this.

But at the time that Judge Durkin had you under oath, you're under oath in front of a judge. I mean, even when you're not under oath in front of a judge, you're an officer of the court. You have to tell the truth. Mr. Hasten can't hear and make misrepresentations to me, even though he's not under oath. He's an officer of the court.

But you're under oath. I mean, the most you would do is say, "Judge, I really can't remember. I've got to -- can I see some notes?"

And I see you, Mr. Cheronis. I know you want to get in to defend him. I'm not trying to -- I mean, he doesn't -- he can take the Fifth or whatever. I'm not -- I'm just saying, like, I'm trying to understand what really happened here.

And I'm sure you were feeling, like, what is going on here? I'm at a contempt hearing based on this idiot who I've been dealing with for 20 years and I'm -- you know, I mean, I get that the circumstances had to be just terrible. And I think your lawyer has described it as bizarre, and it would never arise again. And I'm trying to take all that into account. But I'm -- this is very egregious.

And the other thing that I'm seeing as contemptuous is this idea that you didn't do more, which you've said a lot of times through the papers. And what I just want to say I think you're a little bit missing the point is it -- because I really think you were trying to get Girardi to pay, but the more was

reaching out to the Court.

We have -- we still -- we still have power.  And we -- our orders mean something.  And so the more was not holding a gun to Girardi's head and making him pay.  There was no way for you to do that.  And you said yourself in your allocution, "I tried honey.  I tried yelling, you know, cajoling."  Like, you try these different things -- right? -- with a man who at that point is irrational.  Maybe some of it's dementia.  Maybe it's narcissism.  We don't know.  He's his own problem.

But given that that's not working, what do we do?  We get law enforcement involved, right?  We get the sheriff.  We call the sheriff.  And the sheriff's name is Judge Tom Durkin.

And so as simple as it is for me to say that that is required, how difficult is that to do?  I can't imagine reaching out to a judge to report a colleague.  I can't imagine doing it.  I'm -- easy for me to say that's what you should have done.  And if I were in that situation, I hope it is what I would do.

It was too hard for you to do.  Maybe it never crossed your mind.  I take your counsel's point that, yes, it took Edelson four or five months to do it, or three or four months to do it, and they weren't even at the same firm.  We all want to believe that the lawyer is going to do the right thing.  And, you know, we give professional courtesy and all that.  I understand that.

But I -- it just took me a while of sorting through this to say, wait a minute.  Would he really -- because I kept thinking, yeah, why didn't he get them paid?  Why didn't he get them paid?  And then I finally understood that the contempt was not -- was not reaching out to the Court.

And that, while it would have been incredibly difficult emotionally, professionally -- like, I don't know what Tom Girardi would have done to you -- it's -- it would have solved the -- it would have been your -- it's your ethical duty.  And it was your legal duty.  And you know that because you're -- because you're a stellar lawyer.

So I think I have a handle on the offense and on you.  And I don't know.  You probably went home and had sleepless nights.  I mean, I'm hearing about your sleepless nights since the indictment.  I imagine you had sleepless nights during this time.  And maybe you thought about calling the Court and you didn't.  I don't know.  I hope you did.

So the question is the right sentence.  And I appreciate that both lawyers said, "Ooh, it's a hard decision." It is a really hard decision.  I'm not going to sentence you -- I'm not going to put you in prison for three years.  I really respect the government's opinion on that, but I -- it's just too long for you to go to prison for this because you didn't steal any money.  And I don't -- I just don't see that that would achieve the goals of sentencing.  I think it's -- I think

it would be greater than necessary.

I -- I am concerned about the fact that Mr. Kamon did not get any time in this case -- in this case -- although I understand he got -- ten years?  Did he get ten years in the other case?

MR. HASTEN:  121 months, your Honor.

THE COURT:  Okay.  Yeah, a little over ten years.  Ten years.

I really think you two are in such different ballparks in terms of your conduct even with respect to this case, so it's hard for me to relate the two cases.  I think what is challenging here is that you are a lawyer and the arguments about really deterrence.  You know, not specific deterrence, but deterrence broadly.

So this is what I'm going to do.  I'm going to sentence you to four months' custody.  I'm going to give you another four months of home confinement.  I'm going to give you 200 hours of community service.  I'm going to give you two years' supervised release, a $100 special assessment.

I did not hear anybody talk about a fine.  I don't think a fine is useful here because money is going to be used in terms of the bankruptcy if there's a clawback and in terms of lawsuits.  I mean, I think if there was money owed to the victims of the plane crash, I would feel differently.  But I don't think a fine is a good use of money given the other

pressing matters.

MR. HASTEN: Either of that, your Honor.

THE COURT: So no fine.

Conditions of supervision. Would you waive the reading of them?

MR. CHERONIS: Yes.

THE COURT: Do you want to object to any? I didn't see any objections.

I want to say something else. Had I made a different decision on the guidelines, either by going to the fraud guideline under 2B1 or not imposing a vulnerable victim or not imposing three levels for -- under 2J1.2 or not imposing abuse of a position of trust, I would end up in the same place. I would never give him three years in custody, and I would never give him straight probation. So you can take that to the court of appeals.

Are you going to object to any of the terms of supervised release?

(Counsel conferring.)

MR. CHERONIS: Judge, do we need -- just may I have a moment, Judge? I apologize.

THE COURT: Yeah, sure. Take your time.

(Counsel conferring.)

MR. CHERONIS: Your Honor, just real quick. On page 27, paragraph 7, it's checked. It says, "You shall

refrain from," but nothing is checked. I don't think that's necessary. But 7 is checked, but there's no --

THE COURT: I'll strike that.

Yes, I see that. I'll strike that No. 7. It's alcohol, but I don't think we need that here.

MR. CHERONIS: The financial conditions, Judge. Since there is no fine or restitution, I don't think there's an issue with those.

THE COURT: I'll strike those.

(Counsel and probation conferring.)

MR. CHERONIS: Your Honor -- you can speak to that if you want.

Well, Judge, obviously, you issued home confinement as a part of it, so I think that has to be dealt with.

THE COURT: So I would make that a curfew.

MR. CHERONIS: Right.

THE COURT: That would be set by the probation office in -- wherever he is, Southern District of California.

OFFICER KWONG: Your Honor, also the location-monitoring technology. Will the Court order that as well?

THE COURT: Yes.

OFFICER KWONG: Okay. And then if Mr. Lira is able to pay the cost of location monitoring, will that be ordered?

THE COURT: No.

OFFICER KWONG: Okay. That's it from probation, your Honor.

MR. CHERONIS: I think that's it, your Honor.

THE COURT: Would you like to talk about a report date or a facility?

MR. CHERONIS: It would -- we would want a facility close to California, your Honor.

As far as a report date, we would ask for after the holidays. I think that would be appropriate anyway. Maybe early February.

THE COURT: I'll do first Tuesday in February.

THE CLERK: February 3rd.

MR. CHERONIS: Okay.

And, Judge, I just wanted to point out I wasn't trying to interrupt you, obviously.

THE COURT: No.

MR. CHERONIS: I just wanted to point out, not that it matters at all, but he did tell Judge Durkin about Cesar Castillo. That was just -- not that he didn't say anything about anybody who was owed money.

THE COURT: Thank you.

MR. CHERONIS: I wanted to make that clear.

THE COURT: Thank you. There was a lot to take in.

Okay. Mr. Lira, you have a right to appeal. You have 14 days to appeal. Your lawyers will help you file the notice

of appeal. I don't know that they will handle the appeal, but they'll get the notice on file so that you won't miss that 14-day period. The 14 days starts to run after I do some paperwork, and I won't get that out for a couple of days because of some other obligations I have.

But do you understand your right to appeal?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. All right.

Anything further for me?

MR. HASTEN: Your Honor, pursuant to the plea agreement, the government moves to dismiss Counts I through VIII, X through XII, and the forfeiture allegation of the superseding indictment and also moves to dismiss in its entirety the underlying indictment.

THE COURT: Okay. I'll dismiss the original indictment with prejudice, and I'll dismiss the remaining counts in the superseding indictment with prejudice as to Mr. Lira.

MR. CHERONIS: Thank you.

THE COURT: Thanks, everybody.

MR. HASTEN: Thank you, your Honor.

THE CLERK: All rise.

(Concluded at 1:52 p.m.)

* * * * *

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.


*/s/ LAURA RENKE*                                    *November 5, 2025*
LAURA RENKE, CSR, RDR, CRR
Official Court Reporter